**GREAT LAKES HIGHER EDUCATION CORPORATION, a non-profit Chapter 181 Wisconsin corporation, Plaintiff,**

v.

**Lauro F. CAVAZOS, Secretary of the United States Department of Education; and United States Department of Education, Defendants.**

No. 88–C–159–C.

United States District Court, W.D. Wisconsin.

April 14, 1989.

See also 698 F.Supp. 1464.

David J. Hanson, Michael, Best & Friedrich, Madison, Wis., for plaintiff.

Neil H. Koslowe, Sp. Litigation Counsel, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## ORDER

CRABB, Chief Judge.

In this civil action for declaratory judgment plaintiff challenges the constitutionality of the 1987 amendments to the Higher Education Act of 1965 which mandate the elimination of $250 million from excess cash reserves held by guarantors participating in the Guaranteed Student Loan Program. 20 U.S.C. §§ 1072(e)(1), 1072(e)(2), 1078(c)(1), 1078(f)(1)(B), 1078(c)(9)(A). Plaintiff also challenges the constitutionality of defendants' implementation of those amendments by withholding reinsurance payments due plaintiff until $13,490,858 in excess reserves was recovered. Plaintiff contends that the 1987 amendments abrogate its contractual rights and repudiate federal debts, take its property without compensation and due process, and create classifications that are not rationally related to a legitimate legislative purpose, in violation of its Fifth Amendment rights to just compensation, due process and equal protection, and in violation of the Fourteenth Amendment.

Now before the court are the parties' motions for summary judgment on the Fifth and Fourteenth Amendment claims. Because federal regulation and at least one of the parties' agreements provide express-

ly that the agreements are subject to statutory and regulatory change (and plaintiff has complied with such changes as, for example, the 1986 imposition of a reinsurance fee tied to its claims rate and the 1987 imposition of more stringent due diligence standards), I find that plaintiff's contractual rights are subject to statutory and regulatory amendment and that such amendment may change the terms governing obligations that have already arisen pursuant to the agreements. Accordingly, I conclude that the amendments that changed the terms at issue to require compliance with the elimination of excess reserves provisions do not abrogate plaintiff's contractual rights, and similarly, that the change in defendants' obligations that result from the amendments do not repudiate any federal debt.

Having determined that plaintiff's contractual rights to the receipt of pending as well as future administrative cost allowances and reinsurance payments may be properly conditioned on its compliance with the excess reserves reduction amendments, I find that the effect of the contested amendments is not to take away money in plaintiff's reserve fund but to require it to spend that money for specific Guaranteed Student Loan Program purposes as prescribed by regulation, until its reserve fund reaches a predetermined level. I conclude that such an effect is not a taking within the meaning of the Fifth Amendment. Finally, I find that the classifications created by the contested amendments are reasonably related to a legitimate purpose and do not violate plaintiff's right to equal protection. Accordingly, I will grant defendants' motion for summary judgment.

Based on the parties' proposed findings of fact, supporting affidavits and attached documents, and for the purpose of deciding their summary judgment motions only, I find there is no genuine issue as to the following material facts.[1]

## Findings of Fact

### The Parties

Plaintiff is a non-profit Wisconsin corporation whose principal business since 1986 has been the guaranty and servicing of student loans under the federal Guaranteed Student Loan Program pursuant to §§ 421 *et seq.* of the Higher Education Act of 1965, as amended. 20 U.S.C. §§ 1071 *et seq.*

Defendant Cavazos is the Secretary of the United States Department of Education administering the Guaranteed Student Loan Program pursuant to §§ 421 *et seq.* of the Higher Education Act of 1965, as amended.

Defendant Department of Education is an agency of the United States Government, and administers the Guaranteed Student Loan Program pursuant to §§ 421 *et seq.* of the Higher Education Act of 1965, as amended.

### The Guaranteed Student Loan Program

Under the Guaranteed Student Loan Program, lenders make low-interest loans subsidized by the federal government to students under the protection of guarantees issued by fifty-eight state or private, non-profit agencies, who are in turn reinsured by the Department of Education. Its average annual loan volume is now $7.4 billion.

The program involves five separate parties: the lender, the student borrower, the institution the student attends, the guaranty agency, and the Department of Education.

The guaranty agency is the link between the lender and the Department of Education. It administers the program at the state and local levels. Its primary function is to issue guarantees to lenders on qualifying loans, for which it collects insurance premiums paid by the lenders but passed on to the borrowers. Guaranty agencies must insure one hundred percent of the amount of these loans.

When a borrower fails to repay a loan, the lender must first satisfy due diligence

1. The parties are to be commended on their compliance with this court's summary judgment procedures and on the manner in which they have presented and documented their proposed findings of fact.

collection requirements. It then files a claim with the guaranty agency and the agency pays the claim. It is the agency's obligation to attempt to collect the unpaid balance of the loans on which it has paid default claims directly from the borrowers.

The funds available to guaranty agencies to carry out their responsibilities come from insurance premiums of up to three percent of the loan, charged to lenders and generally paid by student borrowers; federal advances, federal administrative cost allowances, and federal reinsurance payments; a portion of collections on defaulted loans; state appropriations; investments; and other sources. All money received by guaranty agencies must be deposited in their reserves and may be used for Guaranteed Student Loan Program purposes specified by regulation.[2]

Under 34 C.F.R. §§ 682.410(a)(2)–(4), guaranty agencies may use their reserve funds only to: guarantee loans; pay default claims; pay death, disability, and bankruptcy claims; refund overpayments of insurance premiums; pay the Secretary of Education's equitable share of borrower payments; repay advances; and pay for the proper administration of the agency's loan guaranty program.

The Department of Education reinsures the guarantees issued by the guaranty agencies and, subject to applicable laws and regulations, reimburses guaranty agencies who have paid a lender's default claim and have complied with applicable laws and regulations. Under present law the rate of reimbursement is one hundred percent for agencies whose overall claims rate is five percent or lower; ninety percent for agencies whose claims rate is between five percent and nine percent; and eighty percent for agencies whose claims rate is above nine percent (the claims rate is the amount of reinsurance requested to cover payments on lenders' default claims as a percentage of guaranteed loans in repayment at the end of the preceding fiscal year).

The Department of Education also reimburses the guaranty agencies for a portion of their administrative costs, and has provided advances to help the agencies maintain adequate cash reserves for claims and other expenses.

The relationship between the Department of Education and the guaranty agencies is formalized by written agreements: the "insurance program agreement" (20 U.S.C. § 1078(b)); the "federal advances for claim payments agreement;" the "reinsurance" and the "supplemental reinsurance" agreements, now combined into a single "guaranty agreement" (20 U.S.C. § 1078(c)); and the "secondary administrative cost allowance agreement." The contents of the agreements are governed by the Higher Education Act, 20 U.S.C. §§ 1078(b)(2), (c)(2), and they are expressly "subject to subsequent changes in the Act or the regulations that apply to the [Guaranteed Student Loan] Program."[3] 34 C.F.R. § 682.400(d).

Federal appropriations support the Guaranteed Student Loan Program, although the money lent to students under the program comes from banks and other non-governmental sources. In fiscal year 1985, total federal costs under the Guaranteed Student Loan Program were $4.1 billion, of which $3.8 billion was funded by appropriations from Congress. The balance of the costs was funded by revenues from the program, including an origination fee on each loan and a portion of collections on defaulted loans.

In 1986 Congress enacted legislation to contain Guaranteed Student Loan Program

---

**2.** Plaintiff's contention that it enjoys considerable discretion in deciding how it operates does not refute the finding that its reserve funds may be used only for Guaranteed Student Loan Program purposes specified by regulation.

**3.** Plaintiff disputes this finding because it implies that any subsequent changes can eviscerate the obligations of the defendants existing at the time the contracts are changed. Such an implication does not necessarily follow from or refute the finding that the agreements are governed by statute and subject to statutory and regulatory amendments. Moreover, whether a particular change so alters the defendants' obligations as to be constitutionally repugnant is a question of law.

costs. In the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, 100 Stat. 82, 339, enacted on April 7, 1986, Congress directed the Secretary to recover $75 million in federal advances during fiscal year 1988, and to deposit that money in the student loan insurance fund established by 20 U.S.C. § 1081(a), to be used for making payments in connection with defaulted loans under guaranty and reinsurance agreements. Under the Higher Education Amendments of 1986, Pub.L. No. 99–498, 100 Stat. 1268, 1357, enacted on October 17, 1986 (now codified at 20 U.S.C. § 1072(d)(1)), Congress directed the Secretary to recover an additional $35 million in federal advances during fiscal year 1989.

In the Higher Education Amendments of 1986 Congress imposed a reinsurance fee on guaranty agencies for the first time. Also, Congress made it explicit that guaranty agencies were deemed to have "a contractual right as against the United States" to receive reinsurance payments and administrative cost allowances from the Secretary of Education. 20 U.S.C. §§ 1078(c)(1)(A) and (f)(1)(B).

*Reduction of Excess Cash Reserves*

The term "reserves" is not defined in the Higher Education Act or the Secretary of Education's regulations. It refers to the reservoir of funds held by a guaranty agency for future contingencies, and it represents the cumulative amount of money available when the agency's total expenditures are subtracted from its total revenues.

In a report issued on July 2, 1986, the Comptroller General found that guaranty agencies had built up huge and unnecessary reserves, and that some of the agencies were using these reserves for non-Guaranteed Student Loan Program purposes. He recommended that Congress enact legislation setting limits on reserve levels based on the financial risks agencies face, and that the Secretary of Education make final proposed regulations restricting the use of reserves to Guaranteed Student Loan Program purposes. Such regulations were published on November 10, 1986.

On December 22, 1987, Congress amended the Higher Education Act of 1965. The amendments establish a formula for determining the maximum amount of cash a guaranty agency may accumulate in its reserve fund, codified at 20 U.S.C. § 1072(e)(1). The formula is based on guidelines in an August 1986 briefing report by the General Accounting Office that took into account agencies' negative cash flow problems.

Using this formula, the Secretary of Education was required to determine the cash reserve ceiling for each guaranty agency by March 31, 1988.

The amendments modify the provisions concerning reinsurance payments, administrative cost allowances, and reinsurance fees, by making them subject to the cash reserve ceiling provisions. *See* 20 U.S.C. §§ 1078(c)(1)(A) and (f)(1)(B).

The amendments include provisions calling for the recovery of up to a total of $250 million in excess cash reserves. 20 U.S.C. § 1072(e)(3), (4). Under these provisions the Secretary of Education must direct any agency whose case reserves exceed the ceiling to eliminate the excess by (1) repaying advance payments made by the Secretary; (2) withholding and cancelling reimbursement claims that otherwise are payable; (3) reducing the amount to be claimed for administrative costs; (4) paying higher reinsurance fees, or by adopting any other method of reducing payments from or increasing payments to the federal government proposed by the agency and agreeable to the Secretary of Education. 20 U.S.C. § 1072(e)(2).

The 1987 amendments authorize the Secretary of Education to waive the elimination of excess cash reserves if he determines that (1) a guaranty agency's financial position has deteriorated significantly, (2) significant changes in economic circumstances or the loan insurance program render the agency's cash reserve ceiling inadequate, or (3) an agency would be compelled to violate contractual obligations existing on December 22, 1987, that require a specified level of cash reserves. Guaranty agencies must apply for a waiver, and the

Secretary of Education must respond in an expedited manner. 20 U.S.C. § 1072(e)(3).

Under the statutory formula, the Secretary of Education has determined the maximum cash reserves permitted for each guaranty agency and identified those agencies that have reserves exceeding that ceiling. The amount of plaintiff's excess cash reserves was determined to be $13,490,858.

The Secretary of Education is now in the process of recovering excess reserves under the 1987 amendments. All funds recovered under those amendments have been deposited in the student loan insurance fund established by 20 U.S.C. § 1081. As additional funds are recovered, they also will be deposited in the student loan insurance fund.

*Plaintiff's Participation in the Guaranteed Student Loan Program*

Plaintiff has participated in the Guaranteed Student Loan Program under contract with the federal government since 1967. Plaintiff and defendants executed a federal advances agreement, a federal reinsurance agreement, a supplemental guaranty agreement, and an interest subsidy contract, all of which were in effect on December 22, 1987, the effective date of the Omnibus Budget Reconciliation Act of 1987.

Plaintiff obtained federal advances pursuant to the federal advances agreement, which were intended to provide an initial reserve against claims, and which could by used only for making claim payments to lenders to meet plaintiff's contractual guaranty obligations to those lenders. Plaintiff has agreed to repay and has repaid or arranged to repay its federal advances in 1988.

Plaintiff purchases reinsurance from defendants under the reinsurance and supplemental guaranty agreements. Plaintiff pays for this reinsurance at the statutory rate of 0.25 percent based on a claims rate below five percent.

Before the excess reserves amendments were enacted on December 22, 1987, plaintiff received eighty percent of the amount it spent on claims by lenders, provided it met its due diligence and other obligations in paying the claims and servicing the loans. Pursuant to the supplemental guaranty agreement, plaintiff received an additional ten or twenty percent of the amount it spent on claims (raising total reinsurance to ninety or one hundred percent) depending on its default claims rate. Upon enactment of the 1987 amendments to the Higher Education Act, plaintiff's entitlement to reinsurance payments became subject also to its compliance with the excess reserves reduction provisions.

Under the terms of the reinsurance agreements, the reinsurance payments reimburse plaintiff for expenditures already made from its reserve fund to pay claims on guaranteed loans. Plaintiff has advanced such funds based on the understanding that the reinsurance contracts are in force and that reimbursement will be made.[4]

The interest subsidy contract entitles lenders and subsequent holders of loans guaranteed by plaintiff to receive that portion of interest that students are entitled to have paid on their behalf.

The federal advances, supplemental guaranty, and interest subsidy agreements provide that they shall be construed in light of the Higher Education Act and the regulations promulgated thereunder. The reinsurance agreement provides in addition that plaintiff "shall be bound by all changes in the Act or Regulations in accordance with their effective dates."

---

**4.** Plaintiff contends that it advances its own nonfederal funds to pay claims on defaulted loans, and that the reinsurance payments reimburse plaintiff and become plaintiff's property. Defendants contend that because plaintiff's reserve fund includes funds that derive almost exclusively from the federal government, because certain of the monies to be credited to the reserve fund are authorized and limited by the federal government, and because plaintiff may use the reserve fund only for prescribed Guaranteed Student Loan Program purposes, funds taken from the reserve fund cannot be characterized as nonfederal. Whether the federal government's reinsurance payments and administrative cost allowances become plaintiff's property upon receipt of those payments and allowances is disputed by the parties, but this dispute is not material to the resolution of the issues before the court.

Before the excess reserves amendments were enacted on December 22, 1987, plaintiff's agreements with defendants did not require repayment of federal administrative cost allowances, and federal reinsurance payments were required to be repaid only if a loan was improperly originated or serviced.[5]

Plaintiff has loan guaranty contracts with over 670 lenders, involving approximately $2.3 billion of loans for which it has principal guaranty responsibility. If lenders properly originate, service and collect student loans, plaintiff is contractually obligated to guarantee those loans, regardless whether plaintiff receives reinsurance from the federal government.

Prior to December 22, 1987, federal reinsurance was conditioned on plaintiff's and the lenders' compliance with procedural due diligence and other obligations mandated by federal regulations in originating and servicing the loan, and on plaintiff's claims rate. Not every loan guaranteed and purchased by plaintiff is reinsured by the federal government. If plaintiff's claims rate exceeds five percent or if it or its lenders do not meet required due diligence standards, it is required to pay its guaranty obligations to lenders from its reserve fund. Plaintiff's reserve fund functions in part to ensure its ability to guarantee loans and pay default claims pursuant to its contractual guaranty obligations.[6]

The types of loans guaranteed also bear on the risk assumed by plaintiff. Plaintiff is guaranteeing more proprietary school loans each year, and the high rate of default on these loans (fifty-two percent in fiscal year 1988) will make it more difficult for plaintiff to maintain one hundred percent reinsurance. If plaintiff were to experience growth in proprietary loans guaranteed in academic year 1988–89 similar to that of academic year 1987–88, it could face net default costs after federal reinsurance as early as fiscal year 1990 based solely on proprietary defaults.

The administrative cost allowance received by plaintiff may be no greater than one percent of the total new loans guaranteed by plaintiff in any given fiscal year. In recent years, plaintiff's actual administrative costs for all loans have been consistently at least double that amount.

In fiscal year 1988, plaintiff received administrative cost allowances of $2,630,000 and incurred administrative costs, including the reinsurance premium payable to defendants, of $10,627,500. For fiscal year 1989, plaintiff is projected to receive administrative cost allowances of $4,350,000 and to incur administrative costs, including the reinsurance premium payable to defendants, of $13,700,000. These figures do not include loan purchases under plaintiff's guaranty contracts.

Plaintiff's administrative costs from 1967 to December 22, 1987, were approximately $41,606,058. During the same period plaintiff received administrative cost allowances from the federal government of $33,856,-

---

5. Plaintiff proposes as fact that prior to December 22, 1987, defendants did not notify plaintiff that administrative allowances were provided conditionally or subject to repayment, or that reinsurance payments were provided conditionally or subject to repayment unless a loan was improperly originated or serviced. Defendants dispute this proposed finding on the ground that the agreements between plaintiff and defendants were expressly subject to changes in applicable laws and regulations, such as the excess reserves reduction amendments which conditioned the entitlement to reinsurance payments and administrative cost allowances on compliance with the excess reserves reduction provisions.

As discussed in the opinion below, such an express notification of Congress's authority to change the Higher Education Act and to bind plaintiff to such changes renders all terms in plaintiff's agreements conditional in the sense that the parties' rights and obligations pursuant to those agreements may be subject to new or different provisions. Although it may be true that defendants had not notified plaintiff that certain specific terms were subject to change, plaintiff knew that all terms could be changed by legislative or administrative act.

6. Defendants dispute this finding on the ground that the permitted purposes enumerated in the regulations for the use of the reserve fund do not include the guarantee of an agency's contractual obligations. Defendant's contention is refuted by the regulations which explicitly permit the use of the reserve fund to guarantee loans and to pay default claims that arise from the agency's contracts with lenders.

580. New due diligence rules will significantly increase plaintiff's future administrative costs.

Prior to December 22, 1987, plaintiff paid $192,605,044 in default claims to lenders pursuant to its guaranty contracts and received reinsurance payments from the federal government totalling $184,105,843.

Prior to December 22, 1987, plaintiff received $29,722,199 in insurance fees charged to lenders but generally paid by student borrowers. That amount exceeds the total dollar amount of cash or cash equivalents now in plaintiff's reserve fund. That amount does not include investment earnings on insurance fees, which total approximately $14.3 million since 1967.

At no time prior to December 22, 1987, did defendants claim title to the money in plaintiff's reserve fund, with the exception of the federal advances that plaintiff knew were subject to repayment.[7]

*Reduction of Plaintiff's Excess Reserves*

On February 9, 1988, defendants informed plaintiff of the statutory requirement to eliminate excess cash reserves, identified the amount of plaintiff's excess cash reserves as $13,490,858, specified the methods by which plaintiff could satisfy the statutory requirement, and requested that plaintiff either inform defendant which method it was going to use or submit a timely waiver application with supporting documentation. In the letter plaintiff was also notified that if plaintiff failed to respond timely defendants would select the method for recovering the excess funds.

On February 26, 1988, plaintiff informed defendants by letter that its response to defendants' letter of February 9 was contained in the complaint it filed in this court.

Plaintiff did not apply for a waiver of the statutory requirement to eliminate excess cash reserves. None of the special circumstances under which a guaranty agency may request a waiver of payment applies to plaintiff.

On September 8, 1988, defendants wrote plaintiff informing it that because it had refused to select a method for eliminating its excess cash reserves, defendants were going to apply on its behalf the method provided in 20 U.S.C. § 1072(e)(2)(B), by withholding reimbursements otherwise payable to plaintiff for pending and future reinsurance claims to the $13,490,858 that defendants claim is owed by plaintiff as excess reserves.

At the time plaintiff received the September 8, 1988, letter, plaintiff had already submitted insurance claims for the month of August in the amount of approximately $3,839,755. Those claims were processed by defendants, and plaintiff received notification from defendants on September 22, 1988, that the claims were eligible for payment. The claims would normally have been paid on or about October 10, 1988.

Defendants applied plaintiff's reinsurance claims for August 1988 in the amount of $3,839,755, for September 1988 in the amount of $3,990,855, for October 1988 in the amount of $4,242,518.48 (the parties indicate that was the amount claimed for October 1988 but do not provide the exact amount withheld), and a portion of the reinsurance claims for November 1988, toward the amount of excess cash reserves to be recovered from plaintiff. Between October 10, 1988 (when the pending August claims should have been paid), and January 10, 1989 (when the November 1988 claims would have been paid), plaintiff lost approximately $90,000 in interest and will continue to lose $90,611 each month thereafter.

---

**7.** Defendants dispute this finding based on 34 C.F.R. § 682.410(a) and statements in affidavits that restate the contents of that regulatory provision, namely that the reserve fund may contain only funds from certain sources, including all federal funds received by the agency under the Guaranteed Student Loan Program and all income, and that the reserve fund may be used only for certain Guaranteed Student Loan Program purposes. In the affidavits it is also averred that the Higher Education Act has authorized and limited the amounts to be received or retained from certain of the sources of funds required to be placed in the reserve fund. Neither this latter averment nor 34 C.F.R. § 682.410(a) refutes the finding that the federal government did not claim title to the contents of plaintiff's reserve fund, excluding federal advances.

All of the loans for which reinsurance was sought in September 1988 (the August 1988 claims) were issued prior to the effective date of the amendments, December 22, 1987. Because of the grace periods and collection schedules that apply to Guaranteed Student Loan Program loans, it is impossible for any of the claims that were to be paid during the period of excess reserve reduction, October 1988 to January 1989, to involve loans guaranteed after the effective date of the amendments.

All of the reinsurance claims for which payment was withheld were submitted when plaintiff's default claims rate was less than five percent and plaintiff was therefore entitled to one hundred percent reimbursement.[8]

Plaintiff competes regionally and nationally. Over fifty-seven percent of plaintiff's new business last year was from lenders based outside Wisconsin. That percentage has grown steadily over the last three years. As a result of increased due diligence requirements, some lenders whose Guaranteed Student Loan Program loans are guaranteed by plaintiff are selling their Guaranteed Student Loan portfolios, seeking outside servicing, and leaving the Guaranteed Student Loan Program. Any action in addition to the enforcement of new due diligence standards that might further jeopardize the lenders' security, such as the loss of $13.49 million from plaintiff's reserve fund, could cause more lenders to withdraw from active participation in the program.

*Plaintiff's Overall Financial Status*

Defendants collect information from each guaranty agency regarding its fiscal operations, including the amount of its reserve fund, on a report form known as "ED Form 1130." The agency must certify that the information in the report is correct.

For fiscal year 1988 plaintiff certified to defendants that its cash receipts plus accounts receivable were $71,696,197, and its cash disbursements and accounts payable were $68,487,230.

For fiscal year 1987 plaintiff certified to defendants that its cash receipts plus accounts receivable were $58,089,322, and its cash disbursements and accounts payable were $51,017,383.

Plaintiff has certified to defendants a net surplus of cash receipts plus accounts receivable over cash disbursements and accounts payable ("total cash reserves") of $32,322,219 since it commenced operations in 1987.

Plaintiff has certified to defendants that as of September 30, 1988, it has "cash reserves" of $25,118,494.

Plaintiff has certified to defendants that its cumulative unreimbursed claims payments since 1967 is $12,267,451, and that its unreimbursed claims payments during fiscal year 1988 was $727,607. The amount of plaintiff's "cash reserves" is more than twice as much as it has paid in unreimbursed claims since 1967 and more than thirty times as much as it paid in unreimbursed claims during fiscal year 1988.[9]

---

8. Defendants dispute this finding based on references to the record which explain how reinsurance payments are made, how excess reserves were to be recovered, and how defendants will apply plaintiff's reinsurance payments to its excess cash reserve debt until the debt is fully paid, and which show that plaintiff owed defendants for collections, refunds and reinsurance fees. None of these references indicates that the reinsurance payments withheld from plaintiff would not have been fully paid to plaintiff had the excess reserves amendments not been in effect.

9. Plaintiff proposes as fact that if its reserve fund is reduced by 13.49 million or close to fifty percent, its budgeted investment earnings of $2 million will be reduced accordingly. Plaintiff suggests that this reduction in investment earn-

ings will result in a deficit in its guaranty operations budget, which for fiscal year 1988 is $12,565,700 plus $2,300,000 to be added to the reserve fund to strengthen reserves. From this I infer that the budget for guaranty program operations is to be met in part from plaintiff's investment earnings.

Plaintiff contends that the most obvious way to make up the deficit is to charge lenders a higher insurance fee. Defendants object to this contention based on plaintiff's annual report for the fiscal year ending September 30, 1988. Defendants do not explain how the annual report puts plaintiff's contention in dispute. However, because from the report it can be determined that there are funds already in plaintiff's possession to cover a deficit in plaintiff's guaranty operations budget resulting from a reduction in

*Opinion*

The 1987 amendments to the Higher Education Act of 1965 mandate the elimination of $250 million from excess cash reserves held by Guaranteed Student Loan Program guarantors and condition the guarantors' contractual rights to receive reinsurance payments and administrative cost allowances upon compliance with that mandate. Pursuant to the amendments, defendants have determined that plaintiff's reserve fund must be reduced by $13.49 million, and have withheld reinsurance payments due plaintiff until the excess amount was recovered. Plaintiff contends that the amendments and defendants' implementation of them by withholding reinsurance payments due on loans guaranteed prior to the effective date of the amendments abrogate its contractual rights and repudiate federal debts, take its property without compensation and due process, and create classifications that are not reasonably related to a legitimate legislative purpose.

These same claims were raised by another Guaranteed Student Loan Program guaranty agency before the federal district court in *Ohio Student Loan Commission v. Cavazos,* 709 F.Supp. 1411 (S.D.Ohio 1988). In that case the court decided in the plaintiff's favor following a bench trial on the merits. As discussed below, my analysis of the applicable law yields a different result.

*Abrogation of Contractual Rights and Repudiation of Federal Debts*

Plaintiff's first argument is that its contractual rights to reinsurance payments and administrative cost allowances have been abrogated by the subjection of those rights to compliance with the excess reserves reduction provisions.

 Rights against the federal government arising out of a contract with it are property protected by the Fifth Amendment, and Congress may not abrogate such rights. *Lynch v. United States,* 292 U.S. 571, 579–80, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934); *Perry v. United States,* 294 U.S. 330, 354, 55 S.Ct. 432, 436–37, 79 L.Ed. 912 (1935). However, Congress may amend its contracts and alter the terms on which the rights and obligations arising out of the contract are conditioned. *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986); *Perry,* 294 U.S. at 351, 55 S.Ct. at 435. Moreover, no contract term may be claimed as a property right where the contract is expressly subject to Congressional amendment of the act governing the contract. *Bowen,* 477 U.S. at 55–56, 106 S.Ct. at 2398–99.

In *Bowen,* Congress repealed a provision that had allowed states to terminate their agreements with the federal government providing social security coverage for their employees, and prevented states from withdrawing employees from the social security system even if they had filed a termination notice pursuant to that provision before the act was enacted. The termination provision had also been included in the agreements with the states. The Court found dispositive language in the act reserving to Congress the authority to amend the act and agreements entered into in conformity with the act. 477 U.S. at 53, 106 S.Ct. at 2397–98.

The Court cited the *Sinking-Fund Cases,* 99 U.S. 700, 25 L.Ed. 496, 504 (1879) as authority for the proposition that Congress retains the power to amend a law under which an agreement is executed and, by amending the law, to alter the agreement itself. 477 U.S. at 54, 106 S.Ct. at 2398. The Court further ruled that a contractual right arising out of a contract governed by an act subject to the express reservation of Congress's power to amend

---

its projected investment earnings of $2 million, I do not consider as undisputed plaintiff's contention that the most obvious way to make up such a deficit is to raise the insurance fee. Moreover, this dispute and the proposed findings concerning plaintiff's budget for program guaranty operations are not material.

Plaintiff also submits proposed findings of fact that describe the experience of two other Guaranteed Student Loan Program guaranty agencies. I do not include those proposed findings because they are not material.

is not a right that constitutes property protected by the Fifth Amendment. *Id.* at 55, 106 S.Ct. at 2398–99. Therefore, the Court concluded, the legislative amendment of that right is not a taking even if it amounts to the repeal of the right as it did in *Bowen. Id.* at 56, 106 S.Ct. at 2399.

■ In the instant case, at least one of the parties' agreements entered into under the Higher Education Act, that covering reinsurance, and the regulations promulgated pursuant to the Higher Education Act, 34 C.F.R. § 682.400(d), provide expressly that the agreements are subject to subsequent changes in the act and regulations that apply to the Guaranteed Student Loan Program, and that plaintiff is bound by those changes. As in *Bowen,* plaintiff's agreements are expressly subject to Congress's power to amend the act governing those agreements. Therefore, the contractual rights arising out of the agreements do not constitute a property right protected by the Fifth Amendment, and the alteration of the terms conferring such rights do not constitute a taking.

In *Bowen,* the court found that the provision conferring the termination right was merely part of a regulatory program over which Congress retained the power to amend in the exercise of its power to provide for the general welfare. *Id.* at 55, 106 S.Ct. at 2398–99. In the instant case, the provisions governing plaintiff's entitlement to reinsurance payments and administrative cost allowances are part of an administrative program over which Congress retains similar power. Moreover, Congress has exercised that power: most recently in 1987 when it imposed new due diligence requirements on Guaranteed Student Loan Program lenders and guarantors, and in 1986 when it imposed a reinsurance fee on guarantors.

In *Bowen,* the contractual right to withdraw from the social security system was repealed altogether. In the instant case, by contrast, plaintiff's contractual rights to receive reinsurance payments and administrative cost allowances are still intact and may be enforced, but on altered terms. The 1987 amendments merely changed the conditions governing those rights by making them subject to compliance with the excess reserves reduction provisions. *See Sinking Fund Cases,* 99 U.S. at (9 Otto) 721 (Congress has authority to provide by amendment whatever rules it might have prescribed in the original act and the terms governing the performance of contracts already entered into under such act). Such an alteration does not constitute the abrogation of a contractual right.

■ Neither does such an alteration constitute the repudiation of defendants' obligations to pay plaintiff's reinsurance claims and administrative cost allowances. It merely imposes a new condition on defendants' fulfillment of those obligations. Because the obligations are not incurred until the condition is met, there is no debt that can be repudiated.

■ However, plaintiff contends that because defendants' obligations attach to loans that plaintiff guaranteed before the excess reserves reduction amendments were enacted, the imposition of new conditions on those obligations operates retrospectively and therefore deprives plaintiff of property without due process. I have already found that plaintiff's right to reimbursement is not property protected by the Fifth Amendment. Under *Bowen,* 477 U.S. 41, 106 S.Ct. 2390, an amendment that changes the terms of agreements expressly subject to statutory change does not violate the Fifth Amendment, even if it is applied retrospectively.

Plaintiff entered into its agreements with defendants, and guaranteed loans and paid claims pursuant to those agreements, with the general understanding that statutory and regulatory amendments could change the terms of the agreements, including the conditions governing its rights to reimbursement. *See Bowen,* 477 U.S. at 54, 106 S.Ct. at 2398 (state accepted agreement under act that contained language of reservation of Congress's power to amend); *Dayton–Goose Creek Railway v. United States,* 263 U.S. 456, 484, 44 S.Ct. 169, 174, 68 L.Ed. 388 (1924) (railroad operated and accepted custody of excess returns pursuant to statute that expressly declared rail-

road to be trustee of excess). Such an understanding defeats plaintiff's Fifth Amendment challenges to the excess reserves reduction amendments that preserve plaintiff's contractual rights but subject them to compliance with the amendments.

*Taking of Property Without Compensation*

■ Plaintiff contends that the 1987 amendments are a taking without compensation of its property, the money from its reserves. The amendments provide for a variety of methods by which excess reserves may be eliminated. Regardless which method is chosen, it is undisputed that the effect of the amendments is to reduce plaintiff's reserve fund by $13.49 million (excluding interest that would have been earned had the reduction not been implemented). Plaintiff adduces no evidence showing that it has a right to a certain level of reserves beyond its contractual rights to receive reinsurance payments and administrative cost allowances, and I have already found that the terms governing those rights could be changed by legislative amendment and that the changes could operate retrospectively. The effect of those changes could be to lower plaintiff's reserves, but such an effect does not constitute a taking.

Plaintiff also challenges the method by which defendants have forced plaintiff's compliance with the excess reserves reduction amendments, namely the withholding of reinsurance payments until the $13.49 million excess is eliminated. In the *Sinking Fund Cases,* the United States Supreme Court stated that Congress "cannot take away property already acquired under [a federal act] or deprive the corporation of the fruits actually reduced to possession of contracts lawfully made." 99 U.S. at (9 Otto) 620 (quoted in *Bowen,* 477 U.S. at 55, 106 S.Ct. at 2398–99). In the instant case, defendants are not taking away money in plaintiff's reserves. By withholding reinsurance payments that are subject now to compliance with the excess reserves reduction provisions, defendants are merely requiring plaintiff to use the money already in its reserve fund for Guaranteed Student Loan Program purposes as prescribed by statute and regulation. Neither the implementation nor the effect of the 1987 amendments constitutes a taking of plaintiff's reserves.

*Classifications Not Reasonably Related to a Legitimate Purpose*

The 1987 amendments do not require the elimination of excess reserves from guaranty agencies that are found not to have any excess reserves, that must retain excess reserves to comply with state law requirements, or that would violate existing contractual obligations if they complied with the requirement. 20 U.S.C. §§ 1072(e)(1), 1072(e)(1)(E), 1072(e)(3)(A)(iii). Plaintiff contends that these exceptions to the general rule create classifications that are not reasonably related to a legitimate purpose.

■ Classifications created by legislation dealing with economic matters and impinging on no fundamental interests must be upheld against equal protection attack when they are rationally related to a legitimate government purpose. *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981). Legislation containing such a classification is presumed to be rational, *Peterson v. Lindner,* 765 F.2d 698, 705 (7th Cir.1985), and the party challenging it bears the "heavy burden" of demonstrating that "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude the legislature's actions were irrational." *Hodel,* 452 U.S. at 322, 101 S.Ct. at 2382.

■ The parties agree that the purpose of the 1987 amendments was to reduce the federal budget deficit by reducing the federal cost of running the Guaranteed Student Loan Program without materially harming "an agency's ability to fulfill its function in the guaranteed student loan program or [so financially weakening] an agency so as to impair its function." H.R. Conf.Rep. No. 100–495, 100th Cong., 1st Sess. 519 (1987), U.S.Code Cong. & Admin. News 1987, 2313–1, 2313–1265. The parties also concede that this purpose is legit-

imate. The parties dispute whether the classifications of agencies exempted from the requirement to eliminate excess cash reserves are rationally related to that purpose.

It is undisputed that the 1987 amendments were enacted in response to the Comptroller General's July 1986 recommendation that reserve levels be limited based on the financial risks agencies face, and that the statutory formula determining those limits is based on guidelines that were drafted by the General Accounting Office in its August 1986 briefing report and that took into account the financial risks agencies face. It can be reasonably inferred that if the application of the formula results in the determination that an agency has no excess reserves, requiring that agency to reduce its reserves might financially weaken it and impair its ability to function.

It can also reasonably be inferred that requiring agencies to violate state law or to violate existing contractual obligations in order to comply with the new provisions might materially harm those agencies and jeopardize their further operation. Because these classifications are rationally related to legitimate legislative purposes, they do not violate the equal protection component of the Fifth Amendment due process clause.

*Order*

IT IS ORDERED that defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment for defendants.