**McNAMEE, LOCHNER, TITUS & WILLIAMS, P.C., Plaintiff–Counter–Defendant–Appellee and Cross–Appellant,**

v.

**HIGHER EDUCATION ASSISTANCE FOUNDATION, Defendant–Counter–Plaintiff–Appellant and Cross–Appellee.**

**No. 637, Dockets 94–7541, 94–7543.**

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1994.

Decided March 3, 1995.

Scott A. Barbour, Albany, NY (Marc J. Lifset, Kenneth L. Gellhaus, Michael J. Hall, McNamee, Lochner, Titus & Williams, of counsel), for plaintiff-counter-defendant-appellee and cross-appellant.

Marko J. Mrkonich, St. Paul, MN (William M. Tuttle, Oppenheimer Wolff & Donnelly, St. Paul, MN, Robert J. Tracy, Oppenheimer Wolff & Donnelly, New York City, Frederick J. Schreyer, Albany, NY, of counsel), for defendant-counter-plaintiff-appellant and cross-appellee.

Before: VAN GRAAFEILAND, McLAUGHLIN and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This litigation involves the rare and ethically questionable situation of a discharged law firm suing its former client while at the same time claiming the right to continue its representation of the client. Although the United States District Court for the Northern District of New York (Cholakis, J.) characterized the lawsuit as unseemly and anathema to the court, it held substantially in favor of the law firm. To the extent that it did so, we reverse.

## BACKGROUND

Congress enacted the Higher Education Act of 1965 (the "Act") "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub.L. No. 89–329, 79 Stat. 1219. The attempted accomplishment of these purposes has resulted in a complicated set of statutes and regulations. However, generalized descriptions of the program created by the Act and regulations thereunder may be found in numerous cases. *See, e.g., Colorado v. Cavazos,* 962 F.2d 968 (10th Cir.1992), and cases cited therein at 971. Because it is difficult to improve upon Chief Judge Crabb's succinct summary in *Great Lakes Higher Educ. Corp. v. Cavazos,* 711 F.Supp. 485, 487–88 (W.D.Wis.1989), we adopt it in large measure as our own:

Under the Guaranteed Student Loan Program, lenders make low-interest loans subsidized by the federal government to students under the protection of guarantees issued by fifty-eight state or private, non-profit agencies, who are in turn reinsured by the Department of Education....

The program involves five separate parties: the lender, the student borrower, the institution the student attends, the guaranty agency, and the Department of Education.

The guaranty agency is the link between the lender and the Department of Education. It administers the program at the state and local levels. Its primary function is to issue guarantees to lenders on qualifying loans, for which it collects insurance premiums paid by the lenders but passed on to the borrowers. Guaranty agencies must insure one hundred percent of the amount of these loans.

When a borrower fails to repay a loan, the lender must first satisfy due diligence collection requirements. It then files a claim with the guaranty agency and the agency pays the claim. It is the agency's obligation to attempt to collect the unpaid balance of the loans on which it has paid default claims directly from the borrowers.

The funds available to guaranty agencies to carry out their responsibilities come from insurance premiums of up to three percent of the loan, charged to lenders and generally paid by student borrowers; federal advances, federal administrative cost allowances, and federal reinsurance payments; a portion of collections on defaulted loans; state appropriations; investments; and other sources. All money received by guaranty agencies must be deposited in their reserves and may be used for Guaranteed Student Loan Program purposes specified by regulation.

.     .     .     .     .

The Department of Education reinsures the guarantees issued by the guaranty agencies and, subject to applicable laws and regulations, reimburses guaranty agencies who have paid a lender's default claim and have complied with applicable laws and regulations. Under present law the rate of reimbursement is one hundred percent for agencies whose overall claims rate is five percent or lower; ninety percent for agencies whose claims rate is between five percent and nine percent; and eighty percent for agencies whose claims rate is above nine percent (the claims rate is the amount of reinsurance requested to cover payments on lenders' default claims as a percentage of guaranteed loans in repayment at the end of the preceding fiscal year).

.        .        .        .        .

The relationship between the Department of Education and the guaranty agencies is formalized by written agreements: the "insurance program agreement" (20 U.S.C. § 1078(b)); the "federal advances for claim payments agreement;" the "reinsurance" and the "supplemental reinsurance" agreements, now combined into a single "guaranty agreement" (20 U.S.C. § 1078(c)); and the "secondary administrative cost allowance agreement." The contents of the agreements are governed by the Higher Education Act, 20 U.S.C. §§ 1078(b)(2), (c)(2), and they are expressly "subject to subsequent changes in the Act or the regulations that apply to the [Guaranteed Student Loan] Program." 34 C.F.R. § 682.400(d).

*Id.* (footnotes omitted).

As is apparent from Chief Judge Crabb's reference to 34 C.F.R. § 682.400(d), the relationship between the Department of Education and a guaranty agency is not one of immutable longevity. Section 682.409(a) provides, for example, that if the Secretary of Education determines that action is necessary to protect the fiscal interest, the Secretary may direct a guaranty agency to assign to the Secretary any loan held by the guaranty agency on which the agency seeks or has received payment from the Government under its federal insurance agreement with

the agency. *See also* 20 U.S.C. § 1078(c)(8). Section 682.409(c)(4) provides that for each loan assigned, the agency must submit pertinent loan documents, the loan application, the promissory note, any judgment on the loan, etc. Section 682.406(a)(13) provides that a guaranty agency is entitled to reinsurance proceeds on a loan only if the agency assigns the loan to the Secretary when so directed. Pursuant to § 682.413(c)(1), the Secretary may suspend or terminate agreements with a guaranty agency that violate any federal requirement applicable to its guaranty agency contract.

Much of the litigation referred to in *Colorado v. Cavazos, supra,* 962 F.2d at 971, involves a "reserve fund" that each guaranty agency is required to maintain. *See* 34 C.F.R. § 682.410(a)(1). This fund is made up of advances, collections, premiums, etc. in connection with the Student Loan Program. *Id.*

Finally, of particular pertinence in the instant case, the regulations provide for the guaranty agencies' use of "collection contractors" who shall be compensated for their services "solely on a contingency fee basis." §§ 682.410(b)(7)(iv)(B) and (C)(1). These provisions preempt any state law that would "conflict with or hinder satisfaction of the requirements" of the section. *See* § 682.410(b)(9).

## THE LITIGATION

In 1990, Higher Education Assistance Foundation ("HEAF") was a non-profit guaranty agency pursuant to the provisions of the Act. On July 5, 1990, HEAF contracted with the law firm of McNamee, Lochner, Titus & Williams, P.C. ("McNamee") for the latter to assist HEAF in HEAF's statutory obligation of collecting defaulting loans. Pursuant to the contract, McNamee received approximately 744 cases for processing. As pointed out above, when a student borrower defaulted on a loan, HEAF, as a guaranty agency, was required to reimburse the lending organization. HEAF, in turn, was reimbursed by the Department of Education. However, the amount of the reimbursement depended upon the number of claims that had been made by

HEAF and could be as low as eighty percent of HEAF's reimbursement cost.

Apparently HEAF had a high volume of risky loans as a result of which it ran into serious financial problems. In late 1990, the Department of Education informed HEAF that its operations had to be wound down by December 31, 1993 and the entire operation transferred to the Department by that date. HEAF informed McNamee of this mandated closure and transfer, and on April 30, 1992 notified McNamee that its contract with HEAF would be terminated on July 30, 1992. In response to HEAF's efforts to arrange an amicable termination, McNamee stated its position in the following excerpt from its letter of August 5, 1992 addressed to a HEAF representative:

> Until we resolve to our mutual satisfaction the issues raised in this letter, we intend to continue 1) litigating any claim not yet brought to judgment which we believe has a reasonable chance of obtaining a judgment and 2) enforcing all judgments that we believe have a reasonable chance of producing a return.

McNamee continued its collection efforts, refused to remit collected funds and retained all collection files. On April 2, 1993, McNamee brought the instant action in New York Supreme Court seeking a declaratory judgment of the rights of the parties under the 1990 contract. On May 12, 1993, the action was removed to the court below.

In response to a request from the Department of Education that McNamee forward the files and remittances to the Department, McNamee restated its position as follows:

> As you may be aware, this firm currently has pending against HEAF an action for a declaratory judgment with respect to the claims forwarded to us for collection. In this action we have asserted both an attorney's retaining lien and an attorney's charging lien on all filed [sic] in our possession. HEAF has interposed a number of counterclaims, including the claim for breach of contract, and a claim for accounting. Until this litigation is resolved we respectfully decline to remit monies to the Department of Education or to return any documtnet [sic] to the Department. In

addition, until the Court construes the respective rights and obligations under our contract with HEAF of July 5, 1990, and related issues, we believe the remittance to your office of amounts collected by this firm, and the return of files to your office, is potentially prejudicial to our position in this litigation.

■ Following motions for summary judgment made by both parties at the district court's suggestion, the court held that McNamee was entitled to recover for its services on the basis of *quantum meruit* and that it was entitled to a charging lien with respect to those accounts for which McNamee had commenced litigation, but for only those accounts. As of the present time, McNamee has turned over no collected funds and no files.

We have reviewed the provisions of the Higher Education Act in some detail because we believe that the contract between HEAF and McNamee should not be construed in isolation but as it is related to and, to some extent at least, controlled by the standard contract between HEAF and the Department of Education. The public policy behind the Act and the requirements of the public fisc mandate that the Secretary monitor the work of guaranty agencies such as HEAF. Our review of the law satisfies us that the Secretary acted well within his authority when he ordered HEAF to assign the collection files to him and that HEAF had no alternative save to comply with this direction. Moreover, McNamee must have known when it entered into its collection agency contract that this obligation on the part of HEAF could be triggered. Indeed, the existence of this knowledge can be inferred from the language of the contract itself.

The contract was not for any stated term. It provided instead that either party might terminate it upon ninety days written notice to the other, with the proviso that if McNamee failed to perform or in some other manner violated a significant provision in the contract, HEAF might terminate the contract immediately. Upon receipt of a ninety-day notice, McNamee was entitled to retain each account on which within the preceding

forty-five days a payment of $50 had been made or an agreement had been reached for McNamee to be paid monthly, until (1) the account was paid in full, (2) a default in the monthly payments for more than forty-five days existed, or (3) twenty-four months had elapsed since the service of notice—whichever occurred first. All other accounts were to be returned within thirty days. If HEAF terminated the contract because of McNamee's failure to perform, McNamee was required to return all files to HEAF within fifteen days.

HEAF agreed to pay McNamee a twenty-five percent contingency fee on all referred accounts, which "shall constitute the full and sole compensation for all services" rendered by McNamee. This provision, of course, was a restatement of the above-quoted provisions of 34 C.F.R. § 682.410(b)(7)(iv)(C)(1). HEAF also agreed to reimburse McNamee in an amount not to exceed $150 per account for actual court and service of process costs. However, McNamee's obligation to return the accounts to HEAF was not conditioned upon the making of these reimbursements, which was to be accomplished within sixty days after the transfer.

The district court held in substance that, because the contract specifically provided for payment of McNamee's disbursements upon termination but made no mention of attorneys fees, McNamee was entitled to be paid on a *quantum meruit* basis on the more than 700 accounts that had been referred to it and had not been returned prior to the notice of termination. This holding is contrary to the terms of the contract, and it undermines the regulatory scheme that Congress and the Department of Education had constructed for the administration of the Act. Guaranty agencies such as HEAF play a pivotal role in the making, insuring, and collecting of student loans. *See, e.g., Colorado v. Cavazos, supra,* 962 F.2d at 969–70; *see also* 34 C.F.R. § 682.410. It is the obligation of the Department of Education to see that this role is properly performed. By retaining all accounts and funds, McNamee has prevented HEAF from carrying out many of its assigned tasks and has increased the cost of the Student Loan Program to both HEAF

and ultimately the Department of Education. It is a classic case of the tail wagging the dog. This cannot be what the knowledgeable parties intended when the contract at issue was signed.

■ With respect to the six paragraphs representing the "Conclusion" of the district court's Memorandum Decision and Order, we reverse paragraphs (1), (4) and (6) (approving McNamee's request for a *quantum meruit* recovery and a charging lien); affirm paragraphs (2) and (5) (approving HEAF's request for the return of documents and rejecting McNamee's request for a retaining lien after the expiration of the twenty-four month post-termination period); and refrain from ruling on paragraph (3) (mooting a requested accounting). With respect to the judgment entered on April 28, 1994, we reverse holdings (1) and (3) (that McNamee is entitled to a *quantum meruit* recovery and a charging lien), and affirm holding (2) (that McNamee must relinquish possession of non-paying files and may not assert a common law retaining lien with respect to such files). To the extent that McNamee's complaint can be treated as amended to include a claim for money damages, any monetary recovery must be limited to the twenty-five percent contingency fee provided for in paragraph C(1) of the contract and disbursements as provided for in paragraphs B(6), C(2), and E(4) of the contract. This holding is consistent with both the Higher Education Act and the New York state law governing attorney-client contracts. *See, e.g., Jontow v. Jontow,* 34 A.D.2d 744, 744–45, 310 N.Y.S.2d 145, 146–47 (N.Y.App.Div.1970) (an attorney may not recover in *quantum meruit* from a client where the contract between them expressly addresses compensation); *Civil Serv. Employees Ass'n v. Newman,* 88 A.D.2d 685, 685–86, 450 N.Y.S.2d 901, 903 (N.Y.App.Div. 1982) (rights unequivocally waived in a contract will not be enforced), *aff'd* 61 N.Y.2d 1001, 475 N.Y.S.2d 379 (1984). We remand to the district court with instructions to prepare an amended judgment consistent with

this opinion and to issue whatever injunctive orders are required to effectuate these directions.[1]

---

1. In holding as we do, we are not unmindful of the apparent inequity to McNamee that results from our decision. However, to the extent that McNamee does not reap the benefits it might have if the contract had not been terminated, this was a result that McNamee should have anticipated at the time it entered into the contract. McNamee rebuffed HEAF's efforts to ameliorate the adverse effects upon McNamee of the contract's termination. It ignored settled principles of law when it refused to recognize HEAF's absolute right to discharge it, see Teichner v. W & J Holsteins, Inc., 64 N.Y.2d 977, 979, 489 N.Y.S.2d 36, 478 N.E.2d 177 (1985), and it created a clear conflict of interest between itself and HEAF with whom it was at loggerheads, see Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 623 (2d Cir. 1991). Quantum meruit is an equitable remedy. Taylor & Jennings, Inc. v. Bellino Bros. Constr. Co., 106 A.D.2d 779, 780, 483 N.Y.S.2d 813 (N.Y.App.Div.1984) (mem.). A litigant that seeks equity must do equity. Levy v. Braverman, 24 A.D.2d 430, 260 N.Y.S.2d 681 (N.Y.App.Div. 1965) (mem.). Had we been required to decide this case on equitable grounds, we would have been hard put to hold in favor of McNamee. We need say no more than that.