**SOUTH CAROLINA STATE EDUCATION ASSISTANCE AUTHORITY, Plaintiff,**

v.

**Lauro F. CAVAZOS, in his official capacity as Secretary, United States Department of Education, and United States Department of Education, Defendants.**

**Civ. A. No. 3:88–2710–16.**

United States District Court, D. South Carolina, Columbia Division.

May 31, 1989.

J. Emory Smith, Asst. Atty. Gen., Columbia, S.C., for plaintiff.

Glen E. Craig, Asst. U.S. Atty., Columbia, S.C., Neil Koslowe, Sp. Litigation Counsel, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## ORDER

HENDERSON, District Judge.

### I.

This matter is before the Court on cross motions for summary judgment pursuant to Fed.R.Civ.P. 56. All parties agree that no issue of material fact exists and that this matter should be resolved as a matter of law. For the reasons set forth below, the Court grants the plaintiff's motion for summary judgment and denies the defendants' motion.

The South Carolina State Education Assistance Authority ("Authority") is a non-profit agency that guarantees student loans under the federal Guaranteed Student Loan Program ("GSLP"). The GSLP is the largest federal program providing financial assistance to students seeking a post-secondary education. Under the GSLP, various lenders such as commercial banks and savings and loan institutions make low-interest loans to students. The loans are subsidized by the federal government and are further protected by guarantees made by fifty-eight state or private, non-profit agencies. These guarantors are reinsured by the United States Department of Education ("DOE"). The Authority is one such guarantor.

The Authority is the middleman of the GSLP, serving as the link between the lender and the DOE. It collects premiums from lenders (who pass on the premium cost to loan recipients) in exchange for its agreement to repay loans in default due to death, disability, bankruptcy or default of the borrower. When a default occurs the lender files a claim with the Authority and the Authority pays the claim. The Authority attempts to collect from the borrower the loan on which it has paid the default claim. The Authority also encourages program participation and verifies that lenders exercise due diligence. In addition to the premiums collected from lenders, the Authority is also funded by federal advances, federal administrative cost allowances and federal reinsurance payments; collections on defaulted loans; state appropriations; investments; and other sources.

The DOE administers the GSLP nationwide. It has numerous functions including the oversight of the operations of the lenders and guaranty agencies. The DOE makes subsidized interest and special allowance payments directly to the lenders and it reinsures the guaranties issued by the guaranty agencies. If a guaranty agency pays a lender's default claim, and both have exercised due diligence, the DOE makes a reinsurance payment to the guaranty agency. The DOE also reimburses the guaranty agency for a portion of its administrative costs and provides advances to help it maintain adequate cash reserves for claims and other expenses. The rela-

tionship between the DOE and a guaranty agency is set forth in written agreements which are governed by certain federal statutes.

Under the Higher Education Act of 1965, 20 U.S.C. §§ 1071 *et seq.* ("the Act"), as amended in 1986, guaranty agencies are required to insure one hundred percent of the loan amounts for which they issue guaranties. 20 U.S.C. § 1078(b)(1)(G). The DOE, in turn, must reimburse one hundred percent of the amount expended by the agencies under its reinsurance obligations unless their claims rate exceeds a certain level. The 1986 amendments to the Act expressly grant "a contractual right" to guaranty agencies "as against the United States" to receive reinsurance payments and administrative cost allowances from the DOE. Higher Education Amendments of 1986, Pub.L. No. 99–498, § 402(a), 100 Stat. 1268, 1376.

Congress became concerned about the federal costs associated with the program in 1986 and considered numerous amendments to reduce costs. Even as Congress worried about the federal costs, some state and private guarantors apparently were accumulating large surpluses in their reserve funds.[1] As a result of Congress's concern, the United States Comptroller General made numerous recommendations for reducing the federal costs attending the GSLP.

This action arises out of one of the Comptroller's recommendations accepted by Congress and included in the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330–36, ("1987 amendments"), which was enacted on December 22, 1987, and will expire on September 30, 1989. The critical amendment establishes a cap on the amount of "excess reserves" that a guaranty agency may keep on hand and attempts to recoup all reserves beyond that cap. The 1987 amendments establish a formula, now codified at 20 U.S.C. § 1072(e)(1), for determin-

ing the maximum amount of funds a guaranty agency may accumulate in its reserve fund.

Under 20 U.S.C. § 1072(e)(2) the DOE Secretary must direct an agency whose cash reserves exceed the ceiling to "eliminate" the excess by (1) repaying advance payments that are not otherwise due; (2) withholding and cancelling reimbursement claims that are otherwise payable; (3) reducing the amount to be claimed for administrative costs; (4) paying an additional reinsurance fee; or (5) adopting any other acceptable method of reducing payments from or increasing payments to the federal government. The recovered amounts are deposited in the student loan insurance fund established by 20 U.S.C. § 1081(a) and are used exclusively for GSLP purposes.

The 1987 amendments authorize the Secretary to waive the requirements of 20 U.S.C. § 1072(e)(2) under an administrative appeals procedure. A waiver may be granted if an agency would be compelled to violate contractual obligations existing on December 22, 1987, that require a specific level of cash reserves. A guaranty agency must apply for a waiver and the Secretary must respond in an expedited manner.

The 1987 amendments also modify the provisions granting the guaranty agency a "contract right" to reinsurance payments, administrative cost allowances and advances by making them subject to the cash reserve ceiling provisions. The amendments provide that a guaranty agency "shall, *subject to section 1072(e) of this title [the cash reserve ceiling provisions],* be deemed to have a contractual right against the United States" to receive reimbursement for losses on insured loans. Similarly, the amendments provide that a guaranty agency "shall, *subject to section 1072(e) of this title,* be deemed to have a contractual right against the United States" to receive administrative cost allowances. Thus, although the Act had earlier expressly granted to the guaranty

---

**1.** The term "reserves" is not defined in the Act or the DOE regulations. It refers to the reservoir of funds held by a guaranty agency for future contingencies, and it represents the cu-

mulative amount of money available when the agency's total expenditures are subtracted from its total revenues.

agency contractual rights to reinsurance reimbursements and administrative cost allowances, the 1987 amendments now make these rights contingent on the size of the agency's reserves.

On February 9, 1988, the Secretary notified the Authority that it had $2,739,528 in excess cash reserves and that it was required to eliminate the excess by one of the statutorily prescribed methods. Since that date the Authority has continued to submit requests for reinsurance and administrative cost reimbursements to the Secretary and the Secretary has refused to honor those requests. The reinsurance payments now being withheld relate to loans guaranteed by the Authority prior to enactment of the 1987 amendments. The Authority applied for a waiver on the ground that it would be compelled to violate contractual obligations existing on December 22, 1987, if the 1987 amendments were applied to it but the Secretary denied the application. The Authority sued the DOE on October 17, 1988.[2] The parties have stipulated that the amount in controversy is $2,657.87.[3]

The Authority advances seven causes of action. In the first two causes of action it contends that the 1987 amendments constitute a "taking" without compensation of its property rights in its contracts with the defendants and in its cash reserve fund in violation of the fifth amendment to the United States Constitution.[4] In the third cause of action, the Authority contends the 1987 amendments arbitrarily distinguish between guaranty agencies with excess cash reserves and those without cash reserves in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. In the fourth cause of action, the Authority contends that the amendments breach its contracts with the defendants. In the fifth cause of action, the Authority contends the Secretary erroneously calculated the amount of its excess cash reserves in violation of the 1987 amendments. In the sixth cause of action, the Authority contends that elimination of its excess cash reserves would cause it to violate contractual obligations contrary to one of the provisions in the 1987 amendments. In the seventh cause of action, the Authority contends that the 1987 amendments call into question the validity of the public debt in violation of section four of the fourteenth amendment to the United States Constitution.[5]

The Authority seeks both declaratory and injunctive relief. It seeks a declaration that the 1987 amendments are unconstitutional, that the defendants miscalculated the amount of its excess cash reserves and that the defendants erroneously failed to grant it a waiver of the requirements imposed by the 1987 amendments. The Authority also seeks to enjoin the defendants from offsetting amounts owed it by the federal government against its debt under the 1987 amendments.

The Authority originally moved for a preliminary injunction but that motion was

---

**2.** At least three other district courts have issued rulings in virtually identical actions. In *Great Lakes Higher Education Corp. v. Cavazos,* 711 F.Supp. 485 (W.D.Wis.1989), the District Court for the Western District of Wisconsin denied the plaintiff's motion for a preliminary injunction to enjoin the DOE from withholding reimbursement payments from the plaintiff because the plaintiff had an adequate remedy at law. The court in *Great Lakes* later granted summary judgment in favor of the DOE, discussed in greater detail, *infra.* The District Court for the Eastern District of Virginia likewise refused to grant the plaintiff temporary injunctive relief in *Virginia State Education Assistance Authority v. Cavazos,* No. 88–0874–R (E.D.Va. Jan. 10, 1989). In *Ohio Student Loan Comm'n v. Cavazos,* 709 F.Supp. 1411 (S.D.1988), the court held that the amendments are unconstitutional on several different grounds. On March 10, 1989, it issued an additional order rejecting new arguments of the

plaintiff. The Sixth Circuit recently stayed the district court's order. *Ohio Student Loan Comm'n v. Cavazos,* No. 89–3168 and No. 89–3238 (6th Cir. filed May 23, 1989).

**3.** Although the defendants have claimed $2,739,-528 from the Authority, the Authority has agreed to pay $81,841 of this sum which, when deducted, leaves $2,657,687 as the amount in controversy.

**4.** U.S. Const. amend. V provides in part that "private property [shall not] be taken for public use, without just compensation."

**5.** U.S. Const. amend. XIV, § 4 provides in part: "The validity of the public debt of the United States, authorized by law, ... shall not be questioned."

withdrawn; both the Authority and the defendants have now moved for summary judgment on all issues.

## II.

As noted earlier, Congress in 1986 expressly granted to the Authority a contractual right to receive the reinsurance reimbursement and the administrative cost allowances. Higher Education Amendments of 1986, Pub.L. No. 99–498, § 402(a), 100 Stat. 1268, 1376. Congress then made the contractual rights subject to the 1987 amendments regarding limits on excess reserves. The Authority argues that Congress cannot relieve itself retroactively of its contractual obligations; on the other hand, the defendants argue that Congress is authorized to alter its obligations under this program.

The arguments on both sides revolve primarily around *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), and *The Sinking Fund Cases,* 99 U.S. (9 Otto) 700, 25 L.Ed. 496, 504 (1879). In *The Sinking Fund Cases* Congress attempted to amend contracts the federal government had entered into with certain railroad companies. According to the contracts, Congress provided land to the railroads and entered into an agreement requiring the railroads to provide full payment for the land in thirty years. The railroads agreed to furnish the government with transportation and telegraph transmissions on a preferential basis and to set aside toward payment of the principal and interest due on the subsidy bonds issued by Congress to finance railroad expansion fif-

ty percent of the compensation due for these services plus five percent of annual net earnings. Apparently, the railroad companies accumulated more debt in extending the railroads than Congress had anticipated; despite this accumulation of debt, however, the railroads declared dividends rather than setting aside money for repayment of the subsidy bonds. Fearing that the railroads would not have enough to pay the substantial debt when it came due, Congress amended the legislation to require that the government apply one hundred percent of the compensation due the railroads to other sources (one-half to interest debt on the subsidy bonds and the other half invested in United States bonds in a sinking fund established in the United States Treasury). The railroads were also required to pay twenty-five percent of their earnings into the sinking fund. Proceeds of the sinking fund were to be used to pay all remaining interest and principal due on the subsidy bonds on the date of their maturity.

The United States Supreme Court held that the amendments did not deprive the railroads of due process.[6] The Court first noted that Congress, in the original legislation, had expressly reserved the right to amend the legislation. 99 U.S. at 719–20. The Court declared, "It is unnecessary to decide what power Congress would have had over the charter if the right of amendment had not been reserved; for as we think, that reservation has been made." *Id.* Next, the Court noted numerous factors underlying its decision: (1) the railroads had been paying money in dividends rather than preparing to pay a certain, and large, debt to the government; (2) the

---

**6.** Before beginning its analysis, the Court noted that the United States is "prohibited from depriving persons or corporations of property without due process of law." 99 U.S. at 501. Whether *The Sinking Fund* cases are pure "due process" cases or whether the Court's analysis applies equally well to fifth amendment "taking without just compensation" and fourteenth amendment "questioning of the public debt" cases is unclear. Mr. Chief Justice Waite described the issue as whether the amended statute "deprives the Company of its property without due process of law, *or in any other way improperly interferes with vested rights." Id.* (emphasis added). Moreover, other decisions

addressing similar facts have loosely referred to *The Sinking Fund Cases* both as taking cases, *see Bowen v. Public Agencies Opposed to Social Security Entrapment* 477 U.S. 41, 48, 106 S.Ct. 2390, 2394, 91 L.Ed.2d 35 (1986), and as questioning of the debt cases, *see Perry v. United States,* 294 U.S. 330, 354, 55 S.Ct. 432, 436, 79 L.Ed. 912 (1934). Based on *Bowen* as well as on the breadth of *The Sinking Fund Cases* holding itself, this Court views *The Sinking Fund Cases* language establishing limits on legislation that alters the United States' contractual obligations as based not only on the due process clause of the fifth amendment but also on the taking clause of that amendment.

government was both a sovereign and a creditor and "[t]heir rights as sovereign are not crippled because they are creditors, and their privileges as creditors are not enlarged by the charter because of their sovereignty," *id.* at 724; and (3) "The original contracts of loan are not changed. They remain as they were before, and are only to be met at maturity. All that has been done is to make it the duty of the Company to lay by a portion of its current net income to meet its debts when they do fall due." *Id.* at 725.

The Court in *The Sinking Fund Cases,* however, used strong language in setting the outer limits of Congress's authority to alter its contractual obligations:

> [Congress] cannot legislate back to [itself], without making compensation, the lands they have given this Corporation to aid in the construction of its railroad. Neither can they by legislation compel the Corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable.

99 U.S. at 719.

In addition, the Court decided that, even if Congress expressly retains authority to amend its contracts in the legislation authorizing the contracts, it cannot take away benefits already conferred under the contracts:

> That this power [to alter obligations under a contract by amending authorizing legislation] has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the Corporation of the fruits actual-

ly reduced to possession of contracts lawfully made....

....

> ... [W]hatever rules Congress might have prescribed in the original charter for the government of the Corporation in the administration of its affairs, it retained the power to establish by amendment. In so doing it cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into.

*Id.* at 720–21.

The United States Supreme Court addressed a similar issue in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). The issue there was whether, by amending the social security legislation, Congress could deprive a state of the prerogative originally granted in that statute and in an agreement tracking the statutory language to withdraw from the social security program. The Court held that Congress had in the original act reserved the power to amend it and could so amend it because the act itself created no property right under the fifth amendment. The Court observed that "[t]he State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." *Id.* It continued, "Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money," but the section of the social security act at issue was neither a debt of the United States nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, and hence did not rise to the level of a protected property right. *Id.* at 55, 106 S.Ct. at 2398.

Thus, under *The Sinking Fund Cases* and *Bowen,* Congress can alter its agreements if it expressly retains that right in the legislation under which agreements are entered into. As a limit on that rule, however, the United States Supreme Court has made clear that Congress cannot "unmake" contracts in which the other party has acquired a property right, even if it has retained the authority to amend the legislation and thereby the contracts. The first question here, then, is whether the Authority has acquired a property right in the contracts it entered into with the Secretary pursuant to the Higher Education Act before the 1987 amendments. If the Authority has a property right under the contracts to receive reimbursement for guaranty payments and administrative cost allowances, Congress cannot empower the defendants to take away that property right without either the Authority's consent or just compensation.

In *White v. United States,* 270 U.S. 175, 46 S.Ct. 274, 70 L.Ed. 530 (1926), and *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), the United States Supreme Court established guidelines for determining when a party to a contract with the federal government has an enforceable property right in the contract. In *White* a soldier purchased a life insurance policy from the government and named his mother and his aunt as beneficiaries of one-half of the proceeds each. When he entered into the contract, the statute providing the insurance did not list "aunts" as allowed beneficiaries. Before he died the statute was amended to include aunts as beneficiaries. Later, after the insured died, his mother contended that she was entitled to the full proceeds because the amendment could not constitutionally alter the terms of the statute in effect when her son purchased the insurance. The certificate of insurance provided that it was " 'subject in all respects to the provisions of such Act, of any amendments thereto, and of all regulations thereunder, now in force or hereafter adopted, all of which, together with the application for this insurance, and the terms and conditions published under authority of the Act,

shall constitute the contract.' " *White,* 270 U.S. at 180, 46 S.Ct. at 275. The Court ruled against the mother, basing its decision on the facts that the policy was a contract between the deceased and the government, it was expressly subject to changes in the governing statute and the insured's mother could have acquired no rights under the contract until the son died, which occurred after the amendment to the statute. Because the plaintiff (the mother) was not a party to the contract and her interest could not have vested until after the amendment was enacted, the issue presented and decided was a standing issue, that is, "one whose vested rights were not thereby disturbed could not complain of subsequent legislation affecting the terms of the policy." *Lynch,* 292 U.S. at 577, 54 S.Ct. at 842. The questions left unanswered by *White* include when a party's rights are considered vested and, if vested, when they can be divested by subsequent legislation.

*Lynch* assists in answering these questions. There, beneficiaries under government-issued life insurance policies claimed that Congress unconstitutionally repealed the act providing for the policies after having issued and accepted premiums for the policies. The Court declared, apparently on both due process and taking without compensation grounds, that the amendment disavowing the insurance policies was unconstitutional:

> The repeal, if valid, abrogated outstanding contracts; and relieved the United States from all liability on the contracts without making compensation to the beneficiaries.
>
> ... The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a principality, a State or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.
>
> ....
>
> In the administration of all government business economy had become urgent because of lessened revenues and

the heavy obligations to be issued in the hope of relieving widespread distress. Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.

*Id.* at 579–80, 54 S.Ct. at 843–44.[7]

Significantly, the original act in *Lynch* did not include language reserving to the government the right to alter the contracts entered into under the statute by amendment, unlike the legislation in *The Sinking Fund Cases* and in *Bowen.* The contracts of insurance themselves, however, stated that the policy "should be subject to all amendments to the original Act, to all regulations then in force or thereafter adopted." *Id.* The policy form in which this language appeared was prepared by the Veterans Administration. The Court nevertheless concluded that "no power to curtail the amount of the benefits which Congress contracted to pay was reserved to Congress; and none could be given by any regulation promulgated by the Administrator." *Id.* 292 U.S. at 578, 54 S.Ct. at 843. In this Court's view, *Lynch* manifests that language reserving to Congress the power to amend legislation and contracts entered under it must be in the legislation itself to be effective.

The defendants argue, however, that no property right vested in the Authority because the Secretary included, in the regulations issued pursuant to the Higher Education Act and in the contracts between the Authority and the DOE, language reserving to Congress the right to amend the contracts. The defendants rely on the Supreme Court's language in *Bowen* that the provision of the legislation at issue there "simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *Bowen,* 477

U.S. at 55, 106 S.Ct. at 2398. The Court concluded, therefore, that "[s]ince appellees had no property right in the termination clause, [the statute] did not effect a taking within the meaning of the Fifth Amendment." *Id.* at 55–56, 106 S.Ct. at 2398.

On the basis of this language the defendants argue that the Authority could not possess a property right in its contracts with the federal government because of the notice of Congress's ability to amend the Higher Education Act contained in the Secretary's regulations and in the contracts. Indeed, a recent opinion supports the defendants' reading of *Bowen.* In *Great Lakes Higher Education Corp. v. Cavazos,* 711 F.Supp. 485 (W.D.Wis.1989), the court interpreted *Bowen* to mean that "a contractual right arising out of a contract governed by an act subject to the express reservation of Congress's power to amend is not a right that constitutes property protected by the Fifth Amendment." *Id.* 711 F.Supp. at 494–95.

This Court does not agree with the defendants' argument or with the ruling in *Great Lakes.* First, such a reading of *Bowen* disregards the development of the law in this area beginning with *The Sinking Fund Cases.* In *The Sinking Fund Cases* the Supreme Court expressly declared that, regardless of whether Congress reserves the power to amend an agreement made pursuant to a statute by amending the statute, Congress's power to amend an agreement has limits, as this Court earlier discussed, *supra.* If, as the defendants contend, a party to a contract with the federal government under these circumstances does not possess a property right in its contract with the government, then, contrary to *The Sinking Fund Cases,* the power of Congress to alter its obligations under a contract containing a reservation of power to amend would be effectively unlimited because no party to that contract could ever acquire a property right to the benefits due under the contract. Faith in contracts with the govern-

7. *See id.* at 579, 54 S.Ct. at 843 (for due process discussion); *see infra* n. 9.

ment would be seriously shaken by such a ruling.

■ The defendants' and *Great Lakes's* reliance on *Bowen,* however, is misplaced. First, unlike the reservation of Congress's power in the *Bowen* legislation, the reservation of power to amend the contracts made under the Higher Education Act is contained not in the Act, but instead only in the regulations issued by the Secretary and in the contracts themselves.[8] *Lynch* makes clear the significance of this distinction in holding that a reservation of power to amend the act in question contained only in the regulations promulgated under the act and in the insurance contract authorized by the act but not in the act did not reserve to Congress amendatory power. As noted earlier, the Supreme Court held that "no power to curtail the amount of the benefits which Congress contracted to pay was reserved to Congress; and none could be given by any regulation promulgated by the Administrator." *Lynch,* 292 U.S. at 578, 54 S.Ct. at 843. Applying this language here, this Court concludes that the Secretary cannot in his regulations reserve to Congress the power to amend its contracts with the Authority by amending the statute under which the contracts were entered into; only Congress can do that. Nor can such power be created by a term in the contract between the Secretary and the Authority. Nonetheless the defendants argue that, because notice of reservation is included in the contract and because the Authority is more likely to read the contract than the statute, the notice here is sufficient. The issue, however, is not notice; the issue is whether Congress reserved the *power* to amend the contract. Here, it did not, and the notice provisions in the contract and in the regulations cannot grant such power.

■ Accordingly, the Court concludes that here, as in *Lynch,* the Authority has vested property rights in its contracts with the United States to receive reimbursement for payments made to guarantee defaulted loans and to receive advances and administrative cost allowances. As in *Lynch,* the Authority is a party to the contract and has paid valuable consideration for its right to receive reinsurance payments, administrative cost reimbursements and advances—it has agreed to guarantee the loans and it has administered the GSLP on the state level, acting as the middleman between the federal government and the lending institutions. Furthermore, Congress expressly provided in the 1986 amendments that the Authority has a "contractual right" to receive reinsurance payments and administrative cost allowances. This Court rejects the reasoning in *Great Lakes* that these rights could not vest, and instead finds that the Authority's rights constitute property. Because they do constitute property, then, even if a reservation of power to amend the contracts were contained in the legislation authorizing them, Congress could not by amending the legislation take away that property. *The Sinking Fund Cases,* 99 U.S. at 720.

This Court further rejects the defendants' argument that they may withhold these payments as a means of enforcing the requirement in the 1987 amendments that the Authority reduce its excess cash reserves. The defendants contend that the federal government regularly withholds funding for certain programs in order to assure compliance with certain policies and that the withholding of reinsurance payments here is no different. Here, however, the requirement that the Secretary is attempting to enforce is itself not binding on the Authority. "The United States are as much bound by their contracts as are individuals." *Id.* at 719. Thus, just as the Authority could not unilaterally require the Secretary to pay it additional consideration to continue its role in the GSLP, the Secretary cannot unilaterally require the Authority to pay a ransom in order to continue receiving both reimbursements for monies already paid out and administrative cost

---

8. The agreements expressly provide that the Authority "shall be bound by all changes in the Act or Regulations in accordance with their effective dates." Complaint, Exhibit B, ¶ 1. The Secretary's regulations similarly provide that all agreements are "subject to subsequent changes in the Act or the regulations that apply to the [GSL] Program." 34 C.F.R. 682.400(d).

allowances and advances in accordance with the contract.

Finally, there is no difference of legal significance among the prescribed methods the defendants are authorized to use to enforce the 1987 amendments. Regardless of the means chosen to attempt to force the Authority to comply with the requirements of the 1987 amendments, any attempt to coerce its compliance without just compensation constitutes an unconstitutional taking of the Authority's property rights in its contracts with the federal government under the fifth amendment to the United States Constitution and is therefore unconstitutional.

### III.

Accordingly, the Court declares that the 1987 amendments authorize the taking of the Authority's property without just compensation in violation of the fifth amendment to the United States Constitution and are unconstitutional.[9] The Secretary is enjoined from offsetting the Authority's excess cash reserves against future reinsurance payments or other federal payments to which the Authority would otherwise be entitled pursuant to its contracts with the United States. The defendants are ordered to release to the Authority the funds which they have wrongfully withheld within thirty days of the date this order is filed.

IT IS SO ORDERED.

---

9. Because the Court finds the 1987 amendments violate the fifth amendment proscription against taking property without just compensation, it does not reach the Authority's claims that the amendments violate the due process clause of the fifth amendment, the equal protection clause of the fourteenth amendment and the questioning of the public debt clause of the fourteenth amendment. The Court also does not reach the Authority's allegations that the Secretary miscalculated its excess reserves and that he erroneously failed to grant a waiver to the Authority.