**STATE OF DELAWARE, Plaintiff,**

v.

**Lauro F. CAVAZOS, Secretary of Education, and United States Department of Education, Defendants.**

**Civ. A. No. 88–155–JRR.**

United States District Court,
D. Delaware.

Sept. 1, 1989.

John J. Polk and Anne Marie Johnson, State of Del., Dept. of Justice, Wilmington, Del., for plaintiff.

William C. Carpenter, Jr., U.S. Atty., and Kent A. Jordan, Asst. U.S. Atty., U.S. Dept. of Justice, Wilmington, Del., for defendants; John R. Bolton, Asst. Atty. Gen., Neil H. Koslow, Sp. Litigation Counsel and Shawn B. Jensen, U.S. Dept. of Justice, and Brian Siegal, Dept. of Educ., Washington, D.C., of counsel.

## OPINION

ROTH, District Judge.

In this action, the plaintiff, the State of Delaware, seeks declaratory and injunctive relief to prevent enforcement of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330, 1330–38 (the "1987 Amendments") by the defendants, the Secretary[1] and Department of Education, against Delaware's guaranty agency. Delaware claims that the 1987 Amendments, compelling the elimination of excess cash reserves in its Guaranteed Student Loan Program (the "GSL Program" or the "Program"), violate several constitutional provisions: the takings and equal protection component of the fifth amendment; the reserve powers clause of the tenth amendment; the guarantee clause of article 4, section 4; and the public debt clause of section 4 of the fourteenth amendment.

In an Opinion and Order dated October 25, 1988, we denied the defendants' Motion to Dismiss and Motion to Transfer. *Delaware v. Bennett*, 697 F.Supp. 1366 (D.Del. 1988). Since that time the parties have submitted cross motions for summary judgment. These motions have been fully briefed including several supplemental briefs submitted by both parties. The Court heard oral argument on the motions on June 20, 1989.

## I. FACTS

### A. *The GSL Program.*

The GSL Program was created by the Higher Education Act of 1965. The Program provides financial assistance to students seeking a post-secondary education. Under the Program, private lenders make low-interest loans, subsidized by the federal government, to students. The lenders are insured by various state guaranty agencies that 100% of the unpaid principal of qualifying loans will be paid in case of default. In turn, these guaranty agencies are reinsured by the Department of Education.

The Delaware Higher Education Loan Program ("DHELP") is Delaware's guaranty agency; it was created in 1966 to permit Delaware to participate in the GSL Program.[2] DHELP is one of over 50 agencies which guaranty and service student loans under the GSL Program. These guaranty agencies have satisfied statutory criteria, enabling them to receive advances and reimbursements from the Department for losses on defaulted loans that they have insured, as well as payments for administrative costs.

Under the applicable regulations, guaranty agencies must establish and maintain a "reserve fund." 34 C.F.R. § 682.410(a)(1). The reserve fund is used to honor DHELP's commitment to indemnify lenders for defaulted loans. When a borrower defaults on an insured student loan, DHELP, as the guaranty agency, reimburses the lender with moneys from its reserve fund. The federal government be-

---

1. Lauro F. Cavazos was substituted as a defendant, in place of William J. Bennett, following Mr. Cavazos's confirmation as Secretary of Education. Fed.R.Civ.P. 25(d)(1).

2. In November, 1985, the Post Secondary Education Commission (the "Commission"), an agency of the State of Delaware, assumed operational responsibility for DHELP.

comes involved through the reinsurance agreement it has entered into with DHELP. In accordance with this agreement, DHELP pays a premium to the federal government and, in exchange, the government reimburses DHELP, in whole or in part,[3] for the amount it has paid to the private lenders on defaulted loans.

The GSL Program is administered by the Department of Education throughout the country and is subject to extensive regulation. For example, guaranty agencies' sources of income are limited to: (1) a single insurance premium not exceeding three percent of the loan, which is paid by the lender but passed onto the borrower; (2) federal cash advances; (3) federal reimbursements for claims payments; (4) federal administrative cost allowances; (5) a portion (currently 30%) of any amounts collected by the agency from a defaulting borrower after the lender has been paid by the agency and the agency has been reimbursed by the government; (6) state appropriations; (7) gifts, grants, and other sources; and (8) investment earnings. All these moneys must be placed in the agency's reserve fund. *See* 20 U.S.C. §§ 1072, 1078; 34 C.F.R. § 682.410(a)(1). Moreover, the moneys in the reserve funds can be used only for limited purposes. The permitted uses are (1) to guarantee loans; (2) to pay default claims; (3) to pay death, disability, and bankruptcy claims; (4) to refund overpayments; (5) to repay borrower payments; and (6) to repay federal advances. 34 C.F.R. § 682.410(a)(2). And although a portion of these funds may be placed in low-risk securities, any income earned from these funds must be placed in the reserve fund. 34 C.F.R. §§ 682.-410(a)(1)(ix), 682.410(a)(5). Finally, the re-

lationship between the Department and the guaranty agencies is formalized by five written agreements, 34 C.F.R. § 682.400: the insurance program agreement, 20 U.S.C. § 1078(b); the federal advances for claim payments agreement; the reinsurance and the supplemental reinsurance agreements, now combined into a single guaranty agreement, 20 U.S.C. § 1078(c); and the secondary administrative cost allowance agreement. Notably, the applicable regulations provide that "[a]ll of the agreements are subject to subsequent changes in the Act or the regulations that apply to the GSLP and PLUS Program," 34 C.F.R. § 682.400(d), and the agreements themselves provide that "[t]he Agency shall be bound by all changes in the Act or Regulations in accordance with their effective dates."

### B. *The 1987 Amendments.*

The 1987 Amendments were enacted as part of the Budget Act passed by Congress on December 22, 1987, to finance governmental operations in 1988. The 1987 Amendments in the Budget Act are based on a July, 1986, report from the Comptroller General and an August, 1986, General Accounting Office report. These studies concluded that guaranty agencies were accumulating unnecessarily large reserve funds. Congress decided to adopt the recommendations of the General Accounting Office and reclaim $250 million from the guaranty agencies to help finance federal expenditures under the GSL Program. Reclaiming the $250 million, and funding the GSL Program in this manner, helped Congress to meet the guidelines for the federal budget contained in the Gramm–Rudman–Hollings Act.[4]

---

3. Repayment percentages are tied to the guaranty agency's default rate. For example, if a guaranty agency's default rate is five percent or less, the government is obligated to provide total reimbursement to the guaranty agency; ninety percent reimbursement is available to guaranty agencies which have default rates between five and nine percent; if the default rate is greater than nine percent, the guaranty agency receives 80% reimbursement. 20 U.S.C. §§ 1078(c)(1)(A), 1078(c)(1)(B); 34 C.F.R. § 682.405(a)(1). DHELP's default rate has been less than five percent and therefore it qualifies

for 100% reimbursement. Plaintiff's Opening Brief in Support of its Motion for Summary Judgment at 11 & n. 6 (D.I. 23).

4. The 1987 Amendments have also resulted in a number of lawsuits being filed by guaranty agencies contesting the validity of their provisions. To date, six cases have been decided on the merits. The Secretary has prevailed in three cases: *North Carolina State Educ. Assistance Auth. v. Cavazos*, No. 88–961–CIV–5, slip op. (E.D.N.C. July 20, 1989); *Education Assistance Corp. v. Cavazos*, No. 88–1054, slip op. (D.S.D.

Until the 1987 Amendments were enacted, there was no ceiling on the amount of cash that guaranty agencies could accumulate in their reserve funds. The 1987 Amendments, by way of a formula, establish ceilings for the reserve funds for each guaranty agency. The 1987 Amendments require the Secretary to direct any guaranty agency with cash reserves exceeding this ceiling to eliminate this excess cash by one of four prescribed statutory methods.[5] In addition, the 1987 Amendments contain a waiver procedure whereby the Secretary may waive, in whole or in part, the remedies for the elimination of excess cash reserves. A waiver may be granted if it is determined that: (1) a guaranty agency's financial condition has deteriorated significantly; (2) significant changes in economic circumstances have rendered the agency's cash reserve ceiling inadequate; or (3) an agency would be compelled to violate contractual obligations existing on December 22, 1987, that require a specified level of cash reserves. 20 U.S.C. § 1072(e)(3)(A)(i)–(iii).

### C. DHELP's Excess Cash.

On February 9, 1988, the Secretary wrote to the Commission, informed it that DHELP had $3,414,277 in excess cash as calculated by the formula in the 1987 Amendments, and directed the Commission that it must, by February 29, 1988, eliminate the excess, employing one of the four prescribed statutory methods. Following an informal hearing[6] before Department officials, the Department on October 20, 1988, granted a partial waiver in the amount of $732,693.

In granting the partial waiver, the Department stated that it was "based on significant changes in your agency's economic circumstances such that the return of all of the excess cash reserves would render the amount of your reserve fund inadequate for your agency's continued functioning [ (waiver criterion 2) ]." Letter from Dewey L. Newman, Deputy Assistant Secretary for Student Financial Assistance, U.S. Department of Education, to John Corrozi, Executive Director, DHELP, at 1 (Oct. 20, 1988) [hereinafter Waiver Letter], Appendix to Plaintiff's Opening Brief in Support of Summary Judgment at A–209 (D.I. 23A). In addition, the Department found that DHELP had not justified a waiver based on a significant deterioration in its financial position (waiver criterion 1). Waiver Letter at 2. Finally, the Department addressed waiver criterion 3 and concluded that the "agency's contracts with lenders will not be violated by the Department's recovery of the remaining $2,681,584 in excess reserves...." Id. at 3.

In reaching this final conclusion, the Department reasoned that *all* of the agency's lenders were covered by a contract that provided that DHELP must maintain a reserve of "not less than two percent (2%) of the aggregate amount of unpaid principal and interest of all Notes exclusive of the portion not covered by Federal Reinsurance." Id. Therefore, because DHELP was entitled to 100% reinsurance, due to its

---

July 14, 1989); *Great Lakes Higher Educ. Corp. v. Cavazos*, 711 F.Supp. 485 (W.D.Wisc.1989). The plaintiff guaranty agency has prevailed in three cases: *Maryland Higher Educ. Loan Corp. v. United States Dep't of Educ.*, C.A. S 89–270, slip op. (D.Md. June 12, 1989); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 716 F.Supp. 886 (D.S.C.1989); *Ohio Student Loan Comm'n v. Cavazos*, 709 F.Supp. 1411 (S.D.Ohio 1989), *stay entered*, Nos. 89–3168, 89–3238 (6th Cir. May 23, 1989).

**5.** These methods are:
(A) by repaying any advances to such agency made by the Secretary under this section that are not required to be repaid under subsection (d) of this section;

(B) by withholding and cancelling claims for reimbursement otherwise payable under Section 1078(c)(1) of this title;
(C) by reducing the amount of payments for which application will be made by such agency under Section 1078(f) of this title; or
(D) by any other method of reducing payments from or increasing payments to the Federal Government, including payment of additional reinsurance fees in addition to the fees required by Section 1078(c)(9) of this title, as proposed by the agency and agreed to by the Secretary.
20 U.S.C. § 1072(e)(2).

**6.** *See Delaware v. Bennett*, 697 F.Supp. 1366, 1368 (D.Del.1988).

low default rate,[7] the Department concluded that DHELP was not required to maintain a reserve under the terms of these contracts.[8]  *Id.*

Finally, in one short paragraph, the Department addressed older contracts between DHELP and its lenders:

> We note that your agency also submitted a lender contract dating from 1980 which includes the two percent requirement without the exclusion of the federally reinsured amount.  However, counsel for your agency informed the Department that the agreements including this requirement have not been in effect since prior to December 22, 1987.

It is not clear whether these agreements were not in effect because they had been modified with the consent of both parties or because of some other reason.  In fact it is not clear whether this statement was then or is now accurate;  these agreements may still be in effect.  For example, according to Corrozi's supplemental affidavit of January 4, 1989, the two percent of the aggregate outstanding principal amount requirement [hereinafter two percent Guarantee Fund requirement] is still in effect for loans entered into before October, 1987.  Supplemental Affidavit of John F. Corrozi, Appendix to Plaintiff's Opening Brief in Support of Summary Judgment at A–178 & n. 1 (D.I. 23A).  If this two percent Guarantee Fund requirement in the older contracts is still valid, then, according to Corrozi's affidavit, DHELP was required to maintain $2,458,640 in the Guarantee Fund on January 4, 1989, *id.* at A–178, and the defendants' recovery of the $2,681,584 in excess cash would cause the two percent Guarantee Fund requirement in the older contracts to be breached.

In September, 1988, since the Commission had not selected a method of reducing DHELP's excess cash, the Department started to drawdown the reserve fund by withholding reimbursement payments and thereby refusing to honor DHELP claims for reimbursement.

---

**7.**  *See supra* note 3.

**8.**  This position was apparently adopted by counsel for DHELP during their oral presentation to

## II.  ANALYSIS

### A.  *The Takings Clause of the Fifth Amendment.*

The plaintiff argues that the 1987 Amendments violate the takings clause of the fifth amendment by taking the plaintiff's property without just compensation.  Specifically, the plaintiff argues that the Department's efforts to reclaim the excess cash in DHELP's reserve fund is an unconstitutional taking because the excess cash is Delaware's private property.  Additionally, the plaintiff argues that the Department's conditioning DHELP's contractual right to reimbursement on DHELP's compliance with the 1987 Amendments amounts to a taking of the plaintiff's vested contract right to reimbursement which, the plaintiff argues, is property for purposes of the fifth amendment.

First we address the plaintiff's arguments that the 1987 Amendments take the plaintiff's private property in violation of the fifth amendment by requiring elimination of excess cash in DHELP's reserve fund.  In order for the plaintiff to establish that its property has been taken, it must first establish that the property in question is its private property.  Property rights are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).  Therefore, using this definition, it may appear that property rights are rather amorphous.  But a basic understanding of the concept of private property leads to the conclusion that a fifth amendment private property interest in the instant context exists if there is the "right to possess, use and dispose of" the property in question, *id.* at 1003, 104 S.Ct. at 2873 (quoting *United*

---

the Department.  Waiver Letter at 3, Appendix to Plaintiff's Opening Brief at A–211 (D.I. 23A).

*States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945)); *see also Buchanan v. Warley*, 245 U.S. 60, 74, 38 S.Ct. 16, 18, 62 L.Ed. 149 (1917) ("free use, enjoyment and disposal"), as well as "[t]he right to exclude others." *Ruckelshaus*, 467 U.S. at 1011, 104 S.Ct. at 2877.

■ We conclude that Delaware does not possess these fundamental indicia of ownership over the reserve fund. As noted above, the GSL Program is extensively regulated. The types of moneys that can be placed in the fund are enumerated. *See* 20 U.S.C. §§ 1072, 1078; 34 C.F.R. § 682.410(a)(1). In addition, the purposes for which the fund can be used are also limited. 34 C.F.R. § 682.410(a)(2).[9] This extensive regulation over the reserve fund precludes Delaware from claiming that the property in the fund is Delaware's private property. Furthermore, we find that Delaware had no expectation or right, either when it first joined the GSL Program or now, to use moneys in the fund for a purpose other than for GSL Program purposes.[10] Since Delaware does not have the rights to possess, use, enjoy, dispose, or exclude others except as authorized by statute, and since it never did have a legitimate expectation that it would be able to do otherwise, we conclude that the moneys in the reserve fund are not its private property.

Having determined that the cash in the reserve fund is not Delaware's private property protected by the fifth amendment, we now turn to the questions of whether DHELP's right to reimbursement from the Department can be altered or made conditional by the Department and if so whether such an alteration or conditioning results in an unconstitutional taking of the plaintiff's property. This inquiry then focuses on the question of whether Delaware's contractual right to reimbursement can be termed its private property for purposes of the fifth amendment.[11]

9. Delaware is otherwise regulated in its use and funding of the reserve fund. For example: "Delaware's ability to collect insurance premiums from lenders is authorized and limited by 20 U.S.C. § 1078(b)(a)(H); its ability to receive and hold federal advances is authorized and limited by 20 U.S.C. § 1072; its ability to receive federal reinsurance payments is authorized and limited by 20 U.S.C. § 1078(c)(1); its ability to receive federal administrative cost allowances is authorized and limited by 20 U.S.C. § 1078(f); its ability to collect on and retain a portion of defaulted loans is authorized and limited by 20 U.S.C. §§ 1078(c)(2)(D) and (c)(6); and its ability to derive earnings from investing its reserves is authorized and limited by 20 U.S.C. § 1072(b)(3) and 34 C.F.R. §§ 682.410(a)(1)(ix), (a)(3), (a)(4)(i), (a)(5), [and] (a)(6)." Defendants' Answering and Opening Brief at 13–14 (footnote omitted) (D.I. 25).

10. Indeed, the fact that other guaranty agencies were using moneys in their reserve funds for unauthorized purposes was a large factor in the General Accounting Office's recommendations regarding the GSL Program. *See* General Accounting Services, *Better Criteria Needed for Financing Guarantee Agencies* 33–39, Appendix to Defendants' Answering and Opening Brief at A–33–39 (D.I. 25A).

11. Although Delaware, in its complaint, alleged that the 1987 Amendments abrogated the contracts between DHELP and the Department, neither party in their briefs argues that the federal government cannot alter contractual provisions through the exercise of its sovereign powers. The only limitation on the government's ability to alter contractual provisions occurs when property rights have been created by the contract. *See, e.g.*, McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structure*, 76 Cal.L.Rev. 267, 268 (1988) ("The federal government may impair the obligation of contracts without constitutional restraint unless the impairment is also a taking of property or a violation of some other provision of the [c]onstitution."); *id.* at 273. We note that there is dicta in the *Sinking Fund Cases*, 99 U.S. (9 Otto) 700, 25 L.Ed. 496 (1879), that Congress cannot freely abrogate contracts to which it is a party, *id.* at 719–21, which language was cited with approval in *Lynch v. United States*, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934). We find, however, that the language of sections 9 and 10 of Article I of the constitution does not provide for application of the prohibition on impairment of contracts to the federal government: section 10 provides that "[n]o State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts"; section 9, which applies only to Congress, provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." Given this explicit textual difference on the limits of congressional and state powers in the constitution, we conclude that the proper limitation on *Congress's* ability to impair contracts does not involve an analysis of the impairment of contractual obligations under the contracts clause, but most often will

Rights created under contracts and agreements are generally recognized to be property for purposes of the fifth amendment. *See, e.g., Lynch v. United States,* 292 U.S. 571, 579–80, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934). It is therefore not surprising that the plaintiff points to the language in the controlling statute that stated, before the 1987 Amendments, "The guaranty agency shall be deemed to have a contractual right against the United States during the life of such loan, to receive reimbursement according to the provisions of this subsection." 20 U.S.C. § 1078(c)(1)(A).[12] This language, however, does not for two reasons end the inquiry as to whether DHELP's right to reimbursement is property for purposes of the fifth amendment. First, the regulations that govern the agreements between the Department and guaranty agencies provide: "All of the agreements are subject to subsequent changes in the Act or in the regulations that apply to the GSLP or the PLUS program." 34 C.F.R. § 682.400(d). Second, the agreement itself, entered into between Delaware and the Department, contained a similar provision: "The Agency shall be bound by all changes in the Act or Regulations in accordance with their effective dates." Appendix to Plaintiff's Opening Brief at A–200 (D.I. 23A). When a contract, agreement, or statute contains an express reservation of Congress's power to amend, further examination is required.

Recently, in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the Supreme Court addressed the question of the effect of language in an act reserving to Congress the authority to amend the act and agreements entered into

in conformity with the act. In *Bowen,* Congress repealed a provision that had allowed states to terminate their agreements with the federal government providing social security coverage for their state employees. Thus, as a result of Congress's action, states were prevented from withdrawing from the Social Security System. A number of states brought suit under the fifth amendment challenging the constitutionality of Congress's action. The Court held that, in light of Congress's express reservation of power to amend the act and the agreements entered into thereunder, a contractual right arising out of the act could not be termed property for purposes of the fifth amendment. *Id.* at 55, 106 S.Ct. at 2398.

■ Although the reservation of power to amend in *Bowen* was contained in the governing Act, as well as the agreements between the parties, its holding is instructive and leads us to a similar conclusion: In view of our already established finding that the reserve fund is not Delaware's private property, the language in the agreements between DHELP and the Department and in the controlling regulations prevents the contractual right to reimbursement from being characterized as property protected by the fifth amendment. As a result, we conclude that the 1987 Amendments, which condition the right to reimbursement on the elimination of excess cash in DHELP's reserve fund,[13] do not violate the fifth amendment's prohibition against the federal government taking private property without providing just compensation.[14]

It is unnecessary for the right to amend to be stated explicitly in controlling legislation in order for the federal government to

involve an examination of whether there is a fifth amendment protected property interest at stake. *See* McConnell, *supra.*

**12.** The 1987 Amendments amended 20 U.S.C. § 1078(c)(1)(A) to read: "[t]he guaranty agency shall, subject to section 1072(e) of this title, be deemed to have a contractual right against the United States...." (underscoring indicates new matter). Section 1072(e) provides for the elimination of excess cash in the guaranty agencies' reserve funds.

**13.** *Supra* note 12.

**14.** We note that this holding is limited to the particular facts of this case. Thus, for instance we do not address the situation where there is an owner of funds, a holder of those funds, and a third party who has entered into an agreement with the holder of the funds and who subsequently wishes to condition the performance of that agreement on the transfer of some of the funds by the holder either to said third party or to a fourth party.

retain its power to amend that legislation and thereby alter the rights associated with or created by it. *See Miller v. New York,* 82 U.S. (15 Wall.) 478, 496–97, 21 L.Ed. 98 (1872); *see also Stockholders of Peoples Banking Co. v. Sterling,* 300 U.S. 175, 183, 57 S.Ct. 386, 390, 81 L.Ed. 586 (1937); *Pennsylvania College Cases,* 80 U.S. (13 Wall.) 190, 213, 20 L.Ed. 550 (1871). In this case, the contract provisions and the governing regulations provided clear notice to the plaintiff that the agreement into which it was entering with the federal government was subject to future amendment by Congress. Thus, Congress, by passing the 1987 Amendments, did nothing more than that which both parties had agreed Congress could do when the parties entered into the original agreement.

■ Moreover, even if we were to accept the plaintiff's argument that whether the plaintiff had sufficient notice is not the dispositive inquiry, we reject its argument that, to reserve properly the power to amend, appropriate language must be included in the statute and that language in the agreement itself and in the governing regulations is insufficient. Instead, we conclude, as the Supreme Court did in *Bowen,* that it is unnecessary for the sovereign to reserve explicitly the power to amend in any contract into which it enters. As the Court stated in *Bowen:*

> While the Federal Government, as sovereign, has the power to enter contracts that confer vested rights, and the concomitant duty to honor those rights ... we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract.

477 U.S. at 52, 106 S.Ct. at 2396–97 (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)) (other citations omitted).

Lastly, we view our conclusion as being consistent with the Supreme Court's decision in *The Sinking Fund Cases,* 99 U.S. (9 Otto) 700, 25 L.Ed. 496 (1879). In *The Sinking Fund Cases,* the Court first ad-dressed the effect of an express reservation of Congress's authority to repeal, alter, or amend federal statutes. The statutes in question in *The Sinking Fund Cases* governed railroad's obligations to the United States on subsidy bonds. Congress exercised its reserved power to alter the statutes by requiring the railroads to set aside part of their income as a sinking fund to meet their obligations to the government.

The Court rejected the railroads' arguments that the legislation effected a taking of their property, holding that Congress's subsequent legislation was passed in accordance with the "special notice of its intention to retain[ ] full and complete power to make ... alterations and amendments." *Id.* at 720. The Court's holding in *The Sinking Fund Cases* enabled Congress to "change the stipulations of a contract made ... subsequent to and independently of the original statute." *Bowen,* 477 U.S. at 53–54, 106 S.Ct. at 2397. Of course, the Court noted that there are limits on the scope of Congress's power, stating that: "[Congress] cannot unmake contracts that have been already made, but it may provide for what shall be done in the future, and *may direct what preparation shall be made for the due performance of contracts already entered into." The Sinking Fund Cases,* 99 U.S. at 720–21 (emphasis added). We hold that the 1987 Amendments were passed in accordance with "the special notice of [Congress's] intention to retain full and complete power to make alterations and amendments" and, furthermore, that they do nothing more than prescribe "what preparation shall be made for the due performance" of the agreement that DHELP entered into with the Department for reimbursement payments by conditioning those payments on compliance with eliminating the excess cash in DHELP's reserve fund. Accordingly, we reject the plaintiff's argument that the contractual right to reimbursement is property for purposes of the fifth amendment.

■ Even having determined that Delaware cannot assert property rights either

over the cash in the reserve fund or on the right to reimbursement from the federal government, an important issue remains unresolved—whether the defendants are entitled to the full amount of the excess cash they claim.[15] Although the parties have argued about the amount to which defendants are entitled, the parties have focused on whether the defendants have the right to the moneys in the reserve fund instead of on the amount of that liability.

For instance, the plaintiff's submissions make references to the fact that DHELP would be forced to breach the terms of private contracts in effect on December 22, 1987,[16] if the funds are reclaimed by the defendants. If this is true, then it would appear that the waiver was not properly considered by the Department because one of the waiver criteria permits a waiver if private contractual obligations would be breached as a result of reducing the level of the guaranty agency's reserve fund. 20 U.S.C. § 1072(e)(3)(A)(iii). Thus, if a larger waiver should have been granted, perhaps a smaller amount of money is actually in dispute between the parties; yet the parties did not focus on this issue. In addition, there are other disagreements between the parties concerning the figures used to calculate the amount of excess cash in the reserve fund.[17]

Therefore, although we have concluded that the defendants are not constitutionally or otherwise precluded from reclaiming excess cash in the reserve fund, we find that the exact amount for which DHELP is liable to the defendants is still in dispute[18] and cannot be decided on the papers pres-

ently before the Court. Accordingly we will ask the attorneys for the parties for additional briefing on the amount that is in dispute with specific reference being made to the enforceability of the two percent Guarantee Fund requirement in contracts between DHELP and lenders entered into before December 22, 1987, which requirement did not take into account the amount of now available federal reinsurance.

### B. The Equal Protection Component of the Fifth Amendment.

█ The plaintiff asserts that the 1987 Amendments violate the equal protection component of the fifth amendment in that they impose greater hardships on states with small GSL Programs and in that, because the 1987 Amendments are not rationally related to a legitimate government objective, they are discriminatory. We reject this argument.

The Supreme Court's decision in *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), established that a state is not a person for purposes of the fifth amendment. As the Court stated: "The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *Id.* at 323–24, 86 S.Ct. at 816. Although this language was dicta, neither its veracity nor its applicability have been seriously questioned, and we see no reason

---

**15.** Implicit in our conclusion that there are no constitutional or other impediments to enforcement of the 1987 Amendments is our conclusion that we do not need to examine specifically the four prescribed statutory methods of recovering the excess cash because each method is acceptable.

**16.** Specifically, DHELP would be forced to breach the two percent Guarantee Fund requirement. *See supra* p. 239.

**17.** *See, e.g.,* Plaintiff's Opening Brief at 14 (D.I. 23); Defendants' Answering and Opening Brief at 16 (D.I. 25); Plaintiff's Reply Brief at 12–14 & nn. 3–5 (D.I. 27); and Defendants' Reply Brief at 8–9 (D.I. 28).

**18.** We reject the defendants' assertion that Delaware's failure to object to the Department's waiver determination has waived Delaware's right to argue the correctness of that decision. Defendants' Answering and Opening Brief at 17 (D.I. 25). According to the waiver letter from the Department to DHELP, its decision was "the final decision of the Department and no further appeal is provided." Waiver Letter at 3, Appendix to Defendants' Answering and Opening Brief at A–110 (D.I. 25A). Obviously, if the Department does not provide a procedure for appeal of its decision, it is difficult to fathom how Delaware could challenge that decision outside of legal action.

to depart from this accepted standard in this case.

■ Moreover, even if we were to find that Delaware was a person for purposes of the fifth amendment, and that therefore it was deserving of equal protection coverage, we would conclude that the 1987 Amendments are rationally related to a legitimate government objective, and that therefore they do not violate equal protection. For legislation to survive equal protection scrutiny when fundamental rights are not involved, there must merely be a rational relationship of that legislation to a legitimate governmental purpose. *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 461–63, 101 S.Ct. 715, 722–23, 66 L.Ed.2d 659 (1981).

Here, the plaintiff argues that an attempt by the Congress to reduce the budget deficit is not a rational motive or, alternatively, that recovering excess cash from guaranty agencies' reserve funds is not rationally related to accomplishing that goal. Even if the purpose of the 1987 Amendments were to reduce the deficit, we disagree. First, we conclude that reducing the budget deficit is a legitimate objective for Congress. Second, the stated purpose of the 1987 Amendments was to recover $250 million from state guaranty agencies. Every dollar that the government collects under the 1987 Amendments, is money that it does not have to raise from other sources, and therefore helps to reduce the deficit. We therefore conclude that recovering $250 million from guaranty agencies

is rationally related to the legitimate congressional goal of reducing the deficit.[19]

Finally, again assuming that we were to find that Delaware was a person for purposes of the fifth amendment, we would also reject the plaintiff's arguments that the 1987 Amendments violate equal protection because they affect only states with efficient guaranty agencies—those agencies with excess cash in their reserve funds. If anything, the fact that the 1987 Amendments do not require guaranty agencies with financial difficulties to return portions of their reserve funds to the Department supports our conclusion that the 1987 Amendments are rationally related to their stated purpose. After all, it would not be rational for the Department to require agencies without excess cash to return this nonexistent excess cash. Furthermore, efficient guaranty agencies are in fact rewarded for being efficient by the reinsurance agreements which condition the percentage reimbursement on the guaranty agency's default rate.[20]

To conclude, we find that the plaintiff's equal protection argument lacks merit and, consequently, we reject it.

### C. *The Guarantee Clause of the Fourteenth Amendment.*

■ The plaintiff argues that by conditioning DHELP's right to reimbursement on compliance with the 1987 Amendments, the defendants have questioned the validity of the public debt in violation of section

---

**19.** Furthermore, although the motive behind the legislation in question must be rational, the rational motive need not be the actual motive; it needs only to exist. *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *cf. DeSisto College Inc. v. Town of Howey–In–The–Hills*, 706 F.Supp. 1479, 1498–99, 1502–03 (M.D.Fla.1989). Accordingly, we find that Congress could have passed, and perhaps did pass, the 1987 Amendments for other reasons, *e.g.*, to insure the continued viability of the GSL Program. The plaintiff admits that there are efficient agencies and inefficient agencies. Plaintiff's Opening Brief at 28 (D.I. 23). The government asserts that the moneys recovered by operation of the 1987 Amendments will be redistributed throughout

the GSL Program. Defendants' Answering and Opening Brief at 8–9 (D.I. 25). We find that enacting legislation, that will help to insure that every guaranty agency is solvent, is a legitimate purpose and that the 1987 Amendments are rationally related to that objective. A GSL Program that has guaranty agencies that are all solvent will be better able to provide for the needs of students who desire a post-secondary education regardless of where they reside; any disparity between the availability of loans to students who reside in states with efficient guaranty agencies versus the availability of loans to students who reside in states with inefficient guaranty agencies could thereby be minimized.

**20.** *See supra* note 3.

four of the fourteenth amendment.[21] Since we have already concluded that there is no property interest involved either in the cash in the reserve fund or in the contractual right to reimbursement, we conclude here that the 1987 Amendments do not call into question any public debt. Notwithstanding this conclusion, however, we also find that the scope of the guarantee clause of the fourteenth amendment is not so broad as to encompass within its coverage every debt of the United States. The wording of the amendment is specifically directed to bond debts created during the Civil War. According to the precedent that the plaintiff cites to the Court, except for the decision in *Ohio Student Loan Commission v. Cavazos*, 709 F.Supp. 1411 (S.D. Ohio 1989), the clause's application has been limited to bond debts. *See Perry v. United States*, 294 U.S. 330, 354, 55 S.Ct. 432, 436, 79 L.Ed. 912 (1934). We do not find it appropriate to expand the scope of the guarantee clause beyond its traditional understanding, and therefore reject this argument by the plaintiff.

D. *The Reserve Powers Clause of the Tenth Amendment.*

 Finally, the plaintiff alleges that the 1987 Amendments violate provisions in the tenth amendment in that the amendments prevent Delaware from structuring its government in an independent manner. Because Delaware has failed to produce substantive evidence that it was excluded from the national political process that enacted the 1987 Amendments or that it was singled out in a way that left it politically isolated and powerless, this argument must fail. *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 1361, 99 L.Ed.2d 592 (1988); *cf. Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Moreover, Delaware has failed to prove that it is being forced to participate in the GSL Program so that it has no choice but

to be bound by all future amendments to the GSL Program. In fact, one guaranty agency, the Education Assistance Corporation of South Dakota, has terminated its relationship with the Department due to the 1987 Amendments. *Education Assistance Corp. v. Cavazos*, No. 88–1054, slip op. at 9 [1989 WL 141662] (D.S.D. July 14, 1989). We conclude that Delaware remains free to structure its government in the manner it sees fit, including either maintaining or severing its relationship with the Department of Education established through the GSL Program. As such, it follows that the 1987 Amendments do not violate the tenth amendment.

## III. CONCLUSION

For all of the foregoing reasons, we will deny the plaintiff's Motion for Summary Judgment and will grant, as to liability, the defendants' Motion for Summary Judgment. As discussed in the body of this Opinion, the Court will ask the parties for additional briefing on issues relating to the amount of DHELP's liability to the defendants, specifically addressing the present enforceability of the two percent Guarantee Fund requirement found in the older contracts between DHELP and its lenders. Counsel for the parties will be asked to submit a briefing schedule to the Court within two weeks.

An appropriate order will issue.

---

**21.** In pertinent part, this section reads: "The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in supporting the insurrection or rebellion, shall not be questioned." U.S. Const. amend. XIV, § 4.